IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 25-cr-00075-NYW

UNITED STATES OF AMERICA,

         Plaintiff,

v.

LUCY GRACE NELSON,

         Defendant.

---

**MOTION TO DISMISS THE INDICTMENT FOR SELECTIVE PROSECUTION AND MOTION TO COMPEL SELECTIVE-PROSECUTION DISCOVERY**

---

Because a prosecutor can "choose his cases, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." Robert H. Jackson, *The Federal Prosecutor*, (1940).[1] The selective-prosecution doctrine, rooted in the Fifth Amendment's due process and equal protection guarantees, exists precisely so that the courts can check abuses of that tremendous power. That judicial bulwark has perhaps never been more relevant than at this moment in our nation's history—as the Executive Branch has attempted to leverage its prosecutorial discretion as a tool to reward its political supporters and to punish its perceived enemies.

Dismissing an indictment for selective prosecution is a rare and extraordinary remedy. But if there were ever a case that warranted it, it would be this one. The federal government accuses Ms. Nelson of attempted arson and possessing unregistered incendiary devices, alleging that she attempted to vandalize vehicles parked overnight at a closed Tesla dealership by throwing Molotov cocktails near

---

[1] Available at: https://www.roberthjackson.org/speech-and-writing/the-federal-prosecutor/

them. The government doesn't allege that she caused any actual damage or that she risked causing bodily harm to anyone. Nor has Ms. Nelson ever been in trouble with the law before. But because the government chose to charge her under the federal arson statute, she faces a 5-year mandatory minimum sentence if convicted at trial.

Everything about this case is abnormal. It is abnormal for the federal government to prosecute an *attempted* arson, where no property or person was harmed, especially when the same conduct is already being prosecuted by the state. It is abnormal for the local Assistant United States Attorney ("AUSA") assigned to the case to suggest discussing a potential "early resolution" of the case, only for leaders within the Department of Justice ("Main Justice") to intervene and order her and all other line AUSAs "to reject any defense counsel offers on these Tesla cases." And it is abnormal for the President and Attorney General to make public statements expressing an intent to seek the statutory maximum punishment—here, 20 years' imprisonment—for attempted property damage to a private business by an accused with no criminal history whatsoever.

But we don't have to guess why Ms. Nelson has been singled out for federal prosecution "to face the full force of the law"—as the then-Attorney General put it—while others who committed far worse crimes have walked free. Saying the quiet part out loud, the President, the Attorney General, and other Executive Branch officials have publicly blamed Tesla vandalism on "radical lunatic leftists," and declared their intent to make these defendants "go through hell" and "get 20 year jail sentences for what they are doing to Elon Musk and Tesla"—i.e., an administration ally and his private business.

Fortunately, "[o]ur Constitution leaves no room for the exercise of 'purely personal and arbitrary power.'" *Perkins Coie LLP v. U.S. Department of Justice*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). So where, as here, the government chooses to enforce the laws "with an evil eye and an unequal hand," the preservation of liberty demands judicial intervention. *Yick Wo*, 118 U.S. at 373-74.

2

As set forth below, Ms. Nelson has produced not only "some evidence" but also "clear evidence" that political animus was a factor motivating the prosecution of this state-level property crime in federal court. Accordingly, she respectfully requests that the Court compel the government to produce selective-prosecution discovery and, ultimately, to dismiss the indictment with prejudice.

**Factual Background**

In late January and early February 2025, local law enforcement in Loveland, Colorado responded to reports of after-hours vandalism at the Tesla dealership parking lot.[2] They discovered spray-painted messages such as, "Nazi cars" and "Fuck Mu[sk]," on a few parked vehicles, and found a handful of broken glass bottles with ignited rags burning on the lot's pavement. Based on a lead from Flock AI driver surveillance technology, police began to suspect Ms. Nelson was one of the potential vandals. For weeks, police tracked her and her family's real-time, physical location without a warrant. On the night of February 24, 2025, they located her near the Tesla dealership based on a Flock surveillance alert, and placed her under arrest.

The next day, on February 25, 2025, state prosecutors charged Ms. Nelson with three felony offenses, including use of explosives, possession of explosives, and attempted arson. (Exhibit A, Larimer County Court, 2025CR294, state court records.) A few days later, they amended the three arrest-only charges and added seven additional counts, including a criminal mischief charge for the anti-Musk graffiti. (Exhibit B, Amended Complaint and Information, filed 03.10.25.)[3]

On March 5, 2025, the federal government also brought charges against Ms. Nelson based on the same conduct. (Doc. 15.) The indictment charges two violations of 26 U.S.C. § 5861(d), unlawful possession of an unregistered destructive device, the first on January 29, 2025, and the second on February 7, 2025, and one violation of 18 U.S.C. § 844(i), attempted arson of vehicles used in interstate

---

[2] Ms. Nelson's concurrently filed Motion to Suppress Evidence contains a more detailed factual description of the underlying investigation and alleged conduct.

[3] To date, these charges are still pending.

or foreign commerce, on February 7, 2025. (*Id.*) The attempted arson charge carries a 5-year mandatory minimum, and a 20-year maximum, sentence. 18 U.S.C. § 844(i).

### A. President Trump allies with Elon Musk, publicly declares his support for Tesla, and denounces Tesla dealership vandalism as "domestic terrorism"

President Trump wasn't always a fan of Elon Musk, Musk's electric car company Tesla, or electric vehicles. Before his second term, President Trump frequently denigrated them all: claiming, for example, that Musk created "electric cars that don't drive long enough" and "driverless cars that crash," and that "promoting electric vehicles 'was the idea of the Radical Left Fascists, Marxists, & Communists.'"[4] Everything changed, however, when Elon Musk officially endorsed President Trump for a second term.[5] Ever transparent about his motives, President Trump thereafter admitted: "I'm for electric cars. I have to be because Elon endorsed me very strongly."[6] Shortly thereafter, President Trump invited Musk to oversee the administration's newly-created "Department of Government Efficiency" (DOGE)—an organization within the Executive Office of the President, unapproved by Congress.[7]

### 1. Anti-Tesla movements follow videos capturing Elon Musk making controversial gestures on stage at Trump's inauguration

Public opinion of Elon Musk, and Tesla accordingly, quickly soured after President Trump took office. On January 20, 2025, Elon Musk took the stage during an inauguration celebration and twice "slapped his chest with his right hand, before flinging it diagonally upwards, palm face down."[8]

---

[4] https://apnews.com/article/trump-electric-vehicles-past-criticism-hoax-d58758e990f13482e0c6e3a79150abbe# (cataloguing some of President Trump's anti-EV and anti-Tesla statements from 2022-2024).

[5] *Id.*

[6] *Id.*

[7] https://www.whitehouse.gov/presidential-actions/2025/01/establishing-and-implementing-the-presidents-department-of-government-efficiency/; *see also https://www.pbs.org/newshour/politics/watch-white-house-refuses-to-reveal-doge-administrator-during-briefing*

[8] https://time.com/7208614/elon-musk-nazi-salute-reactions-debate-controversy-adl-trump-inauguration/

4

News of the "salute-like movement" spread rapidly, with reporters, politicians, and historians alike commenting that it looked awfully like a Nazi salute.[9]

Over the next few weeks, crowds all over the world attended anti-Musk and anti-Tesla protests, demonstrations, and rallies.[10] Some Tesla owners sold their personal cars to flood the secondary market. Others expressed anti-Musk sentiments by adding bumper sticker disclaimers to their Teslas with messages such as, "I bought this before we knew Elon was crazy," and, "Shut up, Elon."[11] And an extreme minority of dissenters—no more than a handful of people—vandalized Tesla dealerships.[12] Though a few of these incidents involved substantial property damage, none of them resulted in any kind of physical harm or injury.[13]

### 2. Outraged by the public's anti-Musk reactions, President Trump rushes to his new ally's aid

On March 10, 2025, President Trump posted on Truth Social a claim that "the Radical Left Lunatics" were "trying to illegally and collusively" target Tesla—"Elon's 'baby'"—"in order to attack and do harm to Elon[.]"[14] President Trump declared that Musk shouldn't be "punished for putting his tremendous skills to work in order to help MAKE AMERICA GREAT AGAIN" and that he was "a truly great American."[15]

The next day, on March 11, 2025, President Trump held a press conference on the White House lawn. He stood beside Elon Musk and a row of brand-new Tesla vehicles, proudly announcing that he had just personally purchased one.[16] Trump expressed hope that his personal endorsement of

---

[9] *Id.*

[10] https://www.theguardian.com/technology/2025/mar/28/anti-elon-musk-protests-tesla

[11] https://www.businessinsider.com/elon-musk-tesla-owners-bumper-stickers-mad-puffer-trump-2025-3

[12] https://www.nbcnews.com/tech/elon-musk/tesla-vandalism-not-coordinated-trump-musk-claims-rcna197369

[13] https://www.npr.org/2025/03/29/nx-s1-5343986/anti-musk-protests-planned-worldwide

[14] https://truthsocial.com/@realDonaldTrump/posts/114141854575248527

[15] *Id.*

[16] Full transcript available at https://www.govinfo.gov/content/pkg/DCPD-202500346/pdf/DCPD-202500346.pdf

Tesla would help boost Tesla's sales and stock, explaining: "When somebody is a great patriot, they shouldn't be hurt. He's a great patriot . . . [Musk] came out, he endorsed me very strongly, and I admired that and respected that."[17] He also repeatedly defended Elon Musk and praised Tesla, commenting: "I think he's been treated very unfairly by a very small group of people," "I just want people to know that you can't be penalized for being a patriot, and he's a great patriot," and, "I love Tesla."[18]

### 3. Administration officials publicly threaten extraordinary criminal sanctions for any and all Tesla-related vandalism

During the March 11, 2025, Tesla press conference, President Trump also made sure to condemn the "violence"—i.e., the vandalism and property damage—at Tesla dealerships, stating: "We don't want this to happen, and not to somebody that's been so good to our country."[19] He called Tesla vandals "bad guys," promising that they were "going to go through hell."[20] Trump administration officials also publicly expressed these same sentiments. White House spokesperson Harrison Fields told reporters: "The ongoing and heinous acts of violence against Tesla by radical Leftist activists are nothing short of domestic terror."[21] And then-Attorney General Pamela Bondi made similar statements in her official capacity, too.

On March 14, 2025, Attorney General Bondi transparently explained during an interview *why* the DOJ was pursuing Tesla vandalism cases: "They are trying to weaponize against Elon Musk and we are not going to let that happen."[22] She elaborated: "They are targeting Tesla dealerships … they're vandalizing cars. I've already directed an investigation be opened to see how is this being funded, who

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] https://thehill.com/homenews/state-watch/5189239-trump-tesla-dealership-protesters-domestic-terrorists/

[22] https://www.foxbusiness.com/video/6370020686112 at 3:05.

is behind this, doing this … If you're going to touch a Tesla, go to a dealership, do anything, you better watch out because we're coming after you. And if you're funding this, we're coming after you, we're going to find out who you are."[23]

On March 18, 2025, in an official DOJ press release issued entitled, "Violent Attacks Against Tesla Property," Attorney General Bondi announced that the Trump administration planned to "continue investigations that impose severe consequences on those involved in these [Tesla] attacks, including those operating behind the scenes to coordinate and fund these crimes."[24]

On March 19, 2025, President Trump repeated these themes during an interview, agreeing that Tesla dealership vandalism was an "act of domestic political terrorism against one of [his] allies."[25] Describing why he considered Musk to be an ally, Trump explained: "Elon is a patriot . . . He liked me better than he liked these radical lunatics, better than Kamala. Better than Joe . . . And he backed me."[26] And explaining why he considered the Tesla vandalism to be "domestic terrorism," he claimed: "If and when they catch the people . . . and they've caught some already . . . I think you will find out that they are paid by people who are very highly political on the left."[27]

On March 20, 2025, Attorney General Bondi issued another official DOJ press release, this one entitled: "Severe Charges Against Violent Tesla Arsonists."[28] In the press release, the Attorney General described this specific prosecution against Ms. Nelson, along with two other cases, declaring: "All three defendants will face the full force of the law" for their "violent destruction of Tesla properties."[29] Later that night, President Trump declared in a Truth Social post: "People that get

---

[23] *Id.* at 05:30.

[24] https://www.justice.gov/opa/pr/attorney-general-bondi-statement-violent-attacks-against-tesla-property

[25] https://truthsocial.com/@realDonaldTrump/posts/114190845050387383

[26] *Id.*

[27] *Id.*

[28] https://www.justice.gov/opa/pr/attorney-general-pamela-bondi-announces-severe-charges-against-violent-tesla-arsonists

[29] *Id.*

caught sabotaging Teslas will stand a very good chance of going to jail for up to twenty years, and that includes the funders. WE ARE LOOKING FOR YOU!!!"[30] The next day, on March 21, 2025, President Trump posted about Tesla vandalism defendants again, commenting: "I look forward to watching the sick terrorist thugs get 20 year jail sentences for what they are doing to Elon Musk and Tesla. Perhaps they could serve them in the prisons of El Salvador, which have become so recently famous for such lovely conditions!"[31]

On March 31, 2025, in a video posted to the Department of Justice's official Instagram page, Attorney General Bondi announced that Tesla dealership vandalism constituted "a serious threat to public safety," and therefore, the government in all Tesla arson prosecutions would be "seeking 20 years in prison." [32] She further promised that in all of these cases, "there will be no negotiating."

The DOJ has since made good on that promise.

### B. The DOJ directs all local AUSAs—including in this case—"to reject any defense counsel offers on these Tesla cases"

On March 3, 2025, undersigned counsel emailed the AUSA assigned to this case about Ms. Nelson's plan to move for pretrial release during the initial appearance.[33] The AUSA responded to defense counsel's message, and mentioned plea negotiations unprompted, stating: "Love to talk sometime after I provide discovery about whether early resolution possible." (Exhibit C, Email Correspondence of March 3-5, 2025.)

On September 11, 2025, defense counsel emailed the assigned AUSA to follow up on specific discovery that still hadn't been produced, and to ask for "any update as to negotiating a resolution to this case[.]" The AUSA responded: "I have no authority to extend an offer but I do have a D.C.

---

[30] https://truthsocial.com/@realDonaldTrump/114198218638202475
[31] https://truthsocial.com/@realDonaldTrump/114200244380161257
[32] https://www.instagram.com/reel/DH4aieYi9W6/?hl=en
[33] The magistrate rejected the government's request for pretrial detention, and Ms. Nelson has been preparing for trial out of custody, without incident, since March 2025.

contact for you and I'll put some info in that." (Exhibit D, Email Correspondence of September 11., 2025).

The next day, the AUSA followed up by candidly admitting: "We are supposed to reject any defense counsel offers on these Tesla cases." She explained that all settlement requests had to go through Main Justice directly: "we were told to have defense counsel submit their mitigation letter, materials, and request to Associate Deputy Attorney General Aakash Singh U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, D.C. 20530-0001." (Exhibit E, Email Correspondence of September 12, 2025.)

As directed, defense counsel submitted a formal request to engage in plea negotiations to Main Justice, addressed directly to Associate Deputy AG Singh, and sent by way of the local AUSA assigned to the case and the U.S. Attorney of Colorado. (Exhibit F, Email Correspondence of November 25, 2025.) The mitigation packet contained several letters of support, and highlighted (among other things) Ms. Nelson's lack of criminal history, her months of success on pretrial release, and the pending felony charges she still faced in Colorado state court. (Exhibit G, Mitigation Letter). It proposed that the government dismiss the attempted arson count (which carries the 5-year mandatory minimum) in exchange for Ms. Nelson pleading guilty to the other two counts in the indictment. *Id.*

The DOJ declined. Nearly two months later, the U.S. Attorney of Colorado, cc'ing the line AUSA, informed defense counsel that Main Justice had denied Ms. Nelson's request: "We just heard back from Associate Deputy Attorney General Aakash Singh today. We are not authorized to enter a plea agreement which includes dismissal of the count which carries the mandatory minimum sentence." (Exhibit H, Email Correspondence of January 20, 2026.) The email gave no explanation behind Main Justice's decision.

9

**Argument**

**Clear evidence establishes that political animus was a factor motivating the government's selection of Ms. Nelson for federal prosecution.**

Although "[t]he Executive possesses enormous powers to prosecute," with those "powers come restraints." *Abrego Garcia v. Noem*, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025). "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification,'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996), "including the exercise of . . . constitutional rights," *Wayte v. United States*, 470 U.S. 598, 608 (1985). A selective-prosecution claim, then, "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Armstrong*, 517 U.S. at 463.

**A. When "clear evidence" supports a selective-prosecution claim, the burden shifts to the government to disprove intentional discrimination**

A defendant bears the initial burden of establishing that she was selectively prosecuted based on an impermissible, arbitrary classification. *Id.* To meet this burden, she must show that the government's prosecution (1) had a discriminatory effect, and (2) was motivated by a discriminatory (i.e., constitutionally impermissible) purpose. *United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001) (citing *Armstrong*, 517 U.S. at 468); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006). To prove discriminatory effect, the defendant must point to an individual who committed a similar or worse crime but was not similarly prosecuted. *Id.* And to prove discriminatory intent, she must put forth evidence suggesting that the government's decision to enforce the criminal law against her was motivated at least in part by the constitutionally impermissible consideration. *Id.* These two elements "will often overlap," however, since "evidence of differential treatment is also probative of

discriminatory intent." *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1046 n.6 (N.D. Cal. 2016) (citations omitted).

Unlike other types of evidence in a criminal case, defendants have no automatic right to selective-prosecution-related discovery. So, a defendant who raises a selective-prosecution claim must initially rely on evidence she discovers elsewhere. But so long as a defendant comes forward with at least "*some* evidence tending to show the existence of the essential elements of the defense," i.e., "discriminatory effect and discriminatory intent," the court must compel the government to produce discovery relevant to her claim. *James*, 257 F.3d at 1178 (quoting *Armstrong*, 517 U.S. at 468).

On the merits, if a defendant points to "clear evidence" of selective prosecution—whether with or without additional compelled discovery—the burden then shifts to the government to produce compelling evidence that its prosecution was motivated by legitimate, constitutionally permissible reasons only. *Armstrong*, 517 U.S. at 465; *United States v. Abrego Garcia*, 2025 WL 3722394, at *1 (M.D. Tenn. Dec. 23, 2025) (explaining this burden-shifting framework in vindictive-prosecution context).[34] If the government meets this burden, then the ultimate determination—i.e., whether the government selected the defendant for prosecution based on a reason forbidden by the Constitution—is left for the court to resolve after weighing the competing evidence. *Id.* If the government fails to meet its evidentiary burden, or if the court ultimately finds that the defendant was selectively prosecuted "based on impermissible considerations, the equal protection remedy is to dismiss the prosecution[.]" *In re Aiken County*, 725 F.3d 255, 264 n.7 (D.C. Cir. 2013) (Kavanaugh, J.) (citing *Armstrong*, 517 U.S. at 465); *see also Alcaraz-Arellano*, 441 F.3d at 1265 (recognizing dismissal as the proper merits remedy).

---

[34] A similar burden-shifting scheme applies in civil cases, when a plaintiff alleges an equal protection violation and lacks direct evidence of intentional discrimination. *See, e.g., Maccagnan v. Cherry Creek Sch. Dist. No. 5*, --- F.4th ----, 2026 WL 2066706, at *10 & n.17, *13 & n.24 (10th Cir. July 17, 2026) (published).

Here, the evidence set forth below constitutes not only "some evidence" but "clear evidence" that Ms. Nelson was selected for federal prosecution based on her disfavored political affiliation and viewpoints. At a minimum, then, the Court should compel the government to produce selective-prosecution discovery. But because the government will ultimately fail to meet its burden to prove that political animus played no role in the prosecutorial decisions of this case, the Court should also dismiss the indictment with prejudice.

**B. The Constitution forbids the government from selectively prosecuting individuals based on their political affiliations, viewpoints, and beliefs**

This administration has an established practice of aggressively prosecuting people it perceives as opposing President Trump's political causes and personal allies, while allowing loyalists who engaged in similar or far worse crimes to walk free. That policy explains why the government has chosen to haul Ms. Nelson into federal court for the attempted arson of private property, has refused to engage in any plea negotiations, and has threatened to seek the 20-year statutory maximum sentence. But the Fifth Amendment strictly forbids the Executive Branch from exercising its prosecutorial discretion to offer a proverbial carrot to reward its allies and as a proverbial stick to punish perceived dissenters.

"Under the Fifth Amendment's guarantee of equal protection under the law, [] settling personal vendettas by targeting a disliked [] individual for punitive government action is not a legitimate use of the powers of the U.S. government or an American President." *Perkins Coie LLP*, 783 F. Supp. 3d at 168. Indeed, "the Constitution created a government dedicated to equal justice under law, not one in which criminal liability may depend on the defendant's alignment with the policy preferences of the incumbent administration." *United States v. Adams*, 777 F. Supp. 3d 185, 235 (S.D.N.Y. 2025) (internal citation omitted). "To permit criminal prosecutions to be initiated on the basis of arbitrary or irrational factors would be to transform the prosecutorial function from one protecting the public interest through impartial enforcement of the rule of law to one permitting the

exercise of prosecutorial power based on personal or political bias." *United States v. Torquato*, 602 F.2d 564, 568 (3d Cir. 1979). "It is the wisdom of our Constitution that such personal abuses of governmental power are proscribed." *Id.*

Consequently, and as relevant to this case, the government cannot consider an individual's political stances and associations—real or perceived—when deciding whether to exercise its discretion to prosecute that person. *See, e.g.*, *United States v. Navarro*, 627 F. Supp. 3d 1, 4 (D.D.C. 2022) ("A forbidden reason can include prosecution of a defendant based on his 'political beliefs.'"); Bennett L. Gershman, PROSMIS § 4:19, Selective prosecution—Discriminatory intent—First Amendment— Political affiliation, Prosecutorial Misconduct (2d ed., Oct. 2025) ("Political activities and membership in a political party is an arbitrary and improper factor in making charging decisions."). That's because "political belief and association constitute the core of those activities protected by the First Amendment," *Elrod v. Burns*, 427 U.S. 347, 356 (1976), and "the decision to prosecute may not be deliberately based upon an unjustifiable standard" or "other arbitrary classification" such as "the exercise of . . . constitutional rights," *Wayte*, 470 U.S. at 608 (recognizing that government cannot selectively prosecute offenders based on their disfavored political views).

To be clear, a First-Amendment-based claim of selective prosecution is not the same as a First Amendment merits defense. A First Amendment defense on the merits argues that a defendant's expressive conduct cannot be prosecuted because the First Amendment protects it. But in the selective-prosecution context, the baseline assumption is that the defendant has engaged in criminal activity that the First Amendment doesn't protect. The question isn't whether that criminal activity may ever be prosecuted, but instead, whether the government selected a particular defendant for prosecution of that criminal activity—while giving other similarly-situated individuals a pass—because of considerations that the First Amendment does protect. In *Wayte*, for example, a criminal defendant claimed that the government was selectively prosecuting vocal conscientious objectors, including

13

himself, for failing to register with the Military Selective Service, while giving politically neutral violators a pass. 470 U.S. at 608. Everyone who is legally required to register for military service and fails to do so has committed a crime—it is not an activity that the First Amendment protects. Nevertheless, as the *Wayte* Court recognized, the government cannot choose which non-registrants it wants to prosecute "because of" those violators' political viewpoints—which the First Amendment does protect. 470 U.S. at 610.

Here, attempted arson obviously isn't protected by the First Amendment, regardless of one's underlying political motives. Ms. Nelson doesn't contend otherwise. But "[t]he right to associate with the political party of one's choice *is* an integral part of [] basic constitutional freedom" under the First Amendment. *Elrod*, 427 U.S. at 357 (emphasis added). That means that the government cannot deliberately choose to prosecute those arsonists who it believes oppose the incumbent administration to the full extent of the law, while letting arsonists in its own party walk free. As set forth below, "clear evidence" demonstrates that that is precisely what has happened here. Ms. Nelson (and at least one other defendant in a Tesla-related case in this district) was selected for federal prosecution based on her perceived affiliation with the opposing political party and her alleged targeting of a personal and political ally of the current administration. The Constitution balks.

## C. Individuals who committed similar or worse acts haven't been similarly prosecuted by this administration

To make a prima facie showing of discriminatory effect, Ms. Nelson must identify "a similarly-situated individual" who wasn't similarly prosecuted by this administration. *James*, 257 F.3d at 1179. Individuals are considered "similarly situated" when "their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Deberry*, 430 F.3d 1294, 1301 (10th Cir. 2005). This "requirement strikes the proper balance between executive discretion and judicial enforcement of constitutional rights by isolating whether a decision turns on 'unlawful favoritism,' rather than lawful prosecutorial

14

considerations." *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1137 (D.C. Cir. 2023). Put another way, "[t]he similarly situated group is the control group." *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989), *abrogated on other grounds by statute.*

And importantly, "equal protection does not just mean treating identically situated persons identically." *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995). "If a bad person is treated better than a good person, this is just as much an example of unequal treatment as when a bad person is treated better than an equally bad person or a good person worse than an equally good person." *Id.* Accordingly, if others "committed worse infractions than [the defendant] was charged with but were let off with lighter or no sanctions, this was unequal treatment." *Id.*

Ms. Nelson easily clears this bar. During President Trump's second term, this administration treated several individuals who committed substantially worse crimes with significantly more leniency. These other individuals likewise violated the federal arson statute, but unlike Ms. Nelson, their conduct was either politically neutral towards or overtly supportive of President Trump, his administration, and his allies. In contrast, Ms. Nelson has been labeled a "radical left lunatic" and accused of "trying to weaponize against Elon Musk" and attacking his "baby," Tesla.

### 1. The federal arson statute, with its broad reach and harsh mandatory penalties, offers a particularly potent tool for inequitable prosecution

As a general matter, the vast majority of arsons are prosecuted in state court.[35] But because the federal arson statute covers an extremely broad range of conduct, the government very frequently has discretion to charge these cases federally, too.

---

[35] Since President Trump's inauguration in late January 2025, at least 1632 arsons were reported in Colorado. https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/query (from 02-2025 to 07-2026; crime: arson; location: Colorado.) But only three of those cases resulted in federal prosecutions: the instant case, *United States v. Cooper Frederick*; 1:25-cr-00105-NYW, and *United States v. Taylor Michael Bassett*, 1:25-cr-00168-NYW (D. Colo.)

Under 18 U.S.C. § 844, federal jurisdiction exists whenever someone uses fire or an explosive device to damage or attempt to damage any property owned, possessed, or leased by the federal government; any property owned, possessed, or leased by any institution or organization that receives any federal financial assistance; or any property used in or in any activity affecting interstate or foreign commerce. *See* 18 U.S.C. §§ 844(f), (i). So while states retain exclusive jurisdiction over arsons of non-commercial private property, nearly every other type of arson can be charged federally—e.g., arsons of leased homes, apartments, vehicles, commercial buildings, at-home offices, worship spaces with preschools or gift shops, municipal buildings, and property owned or used by essentially any local, state, or federal government organization.[36] In addition to its broad scope, the federal arson statute also imposes severe penalties. Upon conviction, a defendant must serve a mandatory-minimum sentence of 5 years, and a statutory maximum of 20 years, in federal prison. 18 U.S.C. §§ 844(f), (i).

These dual characteristics of the arson statute—its vast reach and its harsh, mandatory penalties—give the government uniquely powerful leverage over individuals in arson cases. It means that in most arson cases, regardless of how serious or minor the allegations, the Executive Branch has the ability to cherry pick certain disfavored defendants for particularly punitive treatment.

### 2. Politically neutral individuals in this district, whose arsons caused significant property damage, successfully negotiated below mandatory minimum sentences

*United States v. Taylor Michael Bassett*, 1:25-cr-00168-NYW (D. Colo.)

In May 2025, the government indicted Mr. Bassett for two counts of arson under 18 U.S.C. § 844(i), two counts of using an explosive device to commit a federal felony under 18 U.S.C. § 844(h)(1), two counts of attempted bank robbery, and being a felon in possession of a firearm. (Doc. 3.) Mr. Bassett, just like Ms. Nelson, faced a 5-year mandatory-minimum sentence under § 844(i). (*Id.*) But

---

[36] *See, e.g.*, *United States v. Gillespie*, 452 F.3d 1183, 1188 (10th Cir. 2006) (statute applies to temple with preschool and gift shop); *Russell v. United States*, 471 U.S. 858, 860 (1985) (statute applies to any rented real estate); *United States v. Elliott*, 684 F. App'x 685, 696 (10th Cir. 2017) (statute applies to any property of any local or state entity receiving federal funds).

because he was also charged under § 844(h)(1), using explosives to commit another federal felony, he additionally faced a 10-year mandatory-minimum consecutive sentence.

In December 2025, the government entered into a plea agreement with Mr. Bassett. (Doc. 23.) Mr. Bassett pleaded guilty to two counts of bank robbery, and the government dismissed both arson charges in exchange. (*Id.* at 1-2.) With respect to the plea's factual basis, Mr. Bassett admitted that on two different occasions at two different locations, he placed an explosive device on an ATM and detonated it, intending to steal the money inside. (Doc. 23 at 6-7.) According to the government, he "destroyed both ATMs, resulting in well over $100,000 in damage." (Doc. 35 at 4.)

At the time of sentencing, Mr. Bassett had multiple felony offenses and several active warrants. (Doc. 35 at 3.) The parties agreed that he was Criminal History Category V. (*Id.*) With no mandatory-minimum sentence on the table and an advisory Guidelines range of 46-57 months, the government requested a low-end sentence of 46 months' imprisonment. (*Id.* at 4.) The Court imposed $61,479.23 in restitution and imposed a 36-month sentence. (Doc. 45 at 2, 6.)

### *United States v. Zane Maher-Young*, 1:24-cr-00096-GPG (D. Colo.)

In April 2024, the government secured an indictment against Mr. Maher-Young, charging him with possessing an unregistered destructive device under 26 U.S.C. § 5861(d) and arson of property owned by an institution receiving federal financial assistance under 18 U.S.C. § 844(f)(1). (Doc. 9.) Under § 844(f)(1), Mr. Maher-Young faced a 5-year mandatory-minimum sentence.

In March 2026, the government entered into a plea agreement with Mr. Maher-Young. (Doc. 70.) Mr. Maher-Young pleaded guilty to the indictment's possession of an unregistered destructive device count, and the government dismissed the 5-year mandatory-minimum arson charges in exchange. (*Id.*) These were the exact terms of the agreement that Ms. Nelson proposed to the government in this case, which Main Justice rejected. *See* Exhibit G.

17

With respect to the plea's factual basis, Mr. Maher-Young admitted that he filled a cooler with gasoline, broke into the press box of his college's football stadium, poured out the cooler's gasoline, and lit it on fire—causing "significant damage" to the building. (Doc. 70 at 7.) He also admitted that, "[u]nsatisfied with the results of the" press box fire, he then refilled the cooler with gasoline, taped two M-80 explosives to the side of the cooler, placed it between two university police vehicles parked in the police department lot, and lit the explosives on fire. (*Id.* at 8.) Mr. Maher-Young admitted that he committed these crimes because of "disagreements with how [the university] had allocated its athletic budget and dissatisfaction with [its] parking enforcement." (*Id.*) He also admitted to causing $241,909.57 in property damage. (*Id.*)

### 3. Politically loyal individuals, whose arsons destroyed government voting machines or injured federal officers, weren't federally prosecuted at all.

<u>*People of the State of Colorado v. William Wayne Bryant*, 2025-CR-101</u>

In July 2025, state prosecutors in Archuleta County, Colorado charged Mr. Bryant with three counts of felony arson causing damage in an amount of $100,000 to $1,000,000 for throwing Molotov cocktails into an Archuleta County municipal building on June 12, 2025. (Exhibit I, Archuleta County Court, 25CR101, state court records.)

According to law enforcement and media reports, Mr. Bryant's Molotov cocktail specifically targeted and destroyed the area of the county clerk's office devoted to storing its Dominion Voting Systems equipment, setting fire to both that part of the building as well as the assessor's office upstairs.[37] Mr. Bryant is reportedly a loyal Republican who shares many of President Trump's false election conspiracy beliefs, including that Dominion's voting machines "helped Democrats steal the 2020 election from President Donald Trump."[38] Mr. Bryant ran for sheriff of Archuleta County in

---

[37] https://www.denver7.com/news/crime/man-accused-of-spreading-election-conspiracies-arrested-in-archuleta-county-elections-office-arson-attack

[38] *Id.*

2022, and, just like President Trump, publicly blamed "Dominion algorithms" for his loss.[39] Echoing President Trump's 2020-election rhetoric, Mr. Bryant claimed: "They don't want patriots, people that are willing to stand up and fight for this country."[40] Colorado Secretary of State Jena Griswold characterized Mr. Bryant's alleged conduct as "another example of how conspiracy theories have 'destabilized' elections."[41]

Because Archuleta County is an institution that receives federal funding, the government had jurisdiction to bring federal charges against Mr. Bryant in addition to the charges already brought in the state.[42] *See* 18 U.S.C. § 844(f)(1).[43] It did not. The government was fully aware of the crime, however, since the ATF and FBI helped local authorities investigate it.[44]

### *United States v. Daniel Ball*, 1:23-cr-00160-RC (D.D.C.)

In May 2023, the government indicted Mr. Ball for, among other things, using an explosive device to commit a federal felony under 18 U.S.C. § 844(h)(1), and assaulting federal officers with a deadly and dangerous weapon, i.e., the explosive device. (Doc. 6.) As noted above, § 844(h)(1) carries a 10-year mandatory-minimum consecutive sentence.

The government alleged that Mr. Ball ignited and threw an M-100 explosive that detonated inside of a tunnel packed with at least 25 on-duty law enforcement officers. (Doc. 1-1; Doc. 11 at 7-8.) According to the government, multiple officers suffered physical and psychological injuries as a

---

[39] https://apnews.com/article/voting-machine-dominion-colorado-arson-9ac1e69a3b809ffc15a1f0917e98cfa0

[40] *Id.*

[41] https://www.cpr.org/2025/07/23/archuleta-county-election-equipment-firebombing-suspect-in-court/

[42] https://www.pagosasun.com/stories/commissioners-discuss-potential-impacts-of-federal-funding-freeze,67928.

[43] Because the Archuleta County assessor's office was damaged by the fire, the statute's interstate commerce subsection, § 844(i), also would have conferred federal jurisdiction. *See, e.g., United States v. Mahon*, 804 F.3d 946 (9th Cir. 2015) (interstate commerce nexus satisfied by city office that organized and participated in chamber of commerce events).

[44] https://www.pagosasun.com/stories/suspect-identified-in-arson-at-archuleta-county-government-building,88500 (Pagosa Springs Police Department press release thanking FBI and ATF for their "extraordinary cooperation" and "collaborative efforts").

19

result of the explosion—including months of hearing loss, and "ten out of ten" pain from continued ear ringing. (Doc. 1-1 at 13-14). The government described the evidence against Mr. Ball as "overwhelming," as his conduct was captured on video from multiple different angles by dozens of different cameras, and he also gave a full confession when subsequently interviewed by agents. (Doc. 11 at 7-8.) Mr. Ball also had an extensive criminal history, with multiple felony and misdemeanor convictions, including for aggravated assault, domestic battery, and drug possession. (Doc. 11 at 8; Doc. 14 at 2.)

On January 21, 2025, the day after President Trump took office, the government moved to dismiss all charges against Mr. Ball with prejudice—including the 10-year mandatory-minimum arson count. (Doc. 74.) The government's motion referenced President Trump's January 20, 2025 Proclamation, which directed the Attorney General to dismiss with prejudice "all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021."[45]

***

When contrasted with Ms. Nelson's case, these examples of similarly-situated individuals provide clear evidence of selective prosecution in two important ways. First, they foreclose the possibility that this administration has simply decided to take a hardline approach to arson generally. And second, they demonstrate that this administration's prosecutorial decision-making in arson cases "turns on 'unlawful favoritism,' rather than lawful prosecutorial considerations." *Frederick Douglass Foundation, Inc.*, 82 F.4th at 1137.

---

[45] https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/ ("This proclamation ends a grave national injustice that has been perpetrated upon the American people over the last four years and begins a process of national reconciliation.").

Since President Trump took office, politically neutral individuals have faced federal arson charges in this district only when they caused significant property damage on multiple occasions. *See Bassett* (attempting to commit bank robbery by destroying two ATMs with explosives); *Maher-Young* (lighting a football stadium's press box on fire and detonating explosives to blow up two university police SUVs). And even then, prosecutors exercised their discretion to dismiss the 5- or 10-year mandatory-minimum arson charges in exchange for a guilty plea to other indicted counts. *See id.* Meanwhile, Trump administration loyalists escaped federal prosecution entirely, even though their arsons in this district and elsewhere caused extensive property damage and serious bodily injury to multiple federal officers. *See Bryant* (Molotov cocktail burned municipal building and voting machines, causing thousands of dollars of damage); *Ball* (detonated an explosive in a tunnel packed with 25 federal officers, causing multiple long-term injuries).

Of course, there's nothing wrong (and something very right) about the federal government tempering its immense prosecutorial power or treating defendants with compassion and leniency. But when the Executive Branch acts with a punitive purpose to deny that same leniency to a less culpable but politically disfavored individual, the Constitution has something to say about it.

Unlike these other similarly-situated individuals, only Ms. Nelson (and Cooper Frederick, who is also charged in a Tesla-related arson case pending before this Court, 25-cr-105-NYW), was federally charged with an *attempted* arson that caused no property damage, inflicted no bodily injury, and risked no physical harm to others. She and Mr. Frederick are the only defendants that have been actively prosecuted in both Colorado state court and federal court based on the same conduct. And unlike several of the above individuals who had prior felony convictions, Ms. Nelson has no criminal record whatsoever. By every objective metric, then, she stands accused of less culpable conduct under more mitigating circumstances than each of her similarly-situated counterparts. If the government were

21

taking into account only standard, permissible considerations when making prosecutorial decisions in this case, one would expect it to afford Ms. Nelson even more leniency, not less.

Yet, the administration refused to drop the 5-year mandatory minimum charge against Ms. Nelson or to engage in any plea negotiations whatsoever. Only in these Tesla-related cases has the administration publicly claimed that the attempted property damage of a private business constitutes "domestic terrorism." And only in these cases has the administration expressed an intent to seek the 20-year statutory maximum sentence upon conviction. Other than political animus, there is no other plausible explanation for why the administration would treat Ms. Nelson so differently, and so much more harshly, than other individuals who engaged in far more serious crimes.

As set forth below, the administration's drastically disparate treatment of Ms. Nelson provides powerful circumstantial evidence of discriminatory intent—even without any additional context or information. *See Maccagnan*, 2026 WL 2066706, at *10, n.17, *13 & n.24 (published) (evidence of disparate treatment constitutes circumstantial proof of intentional discrimination).

But there's far more.

### D. Clear evidence establishes that this administration intentionally singled out Ms. Nelson for federal prosecution based on political animus

The second prong of a selective-prosecution claim requires the defendant to identify evidence suggesting that her prosecution "was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465. "Discriminatory intent can be shown by either direct or circumstantial evidence." *Alcaraz-Arellano*, 441 F.3d at 1264. And it "implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610. In other words, "[t]he discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision." *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157, 1168 (10th Cir. 2003) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977)).

Here, both direct and circumstantial evidence demonstrates that this administration's political animus towards Ms. Nelson's anti-Musk sentiments was "a motivating factor in the decision" to federally prosecute her.

1. **This administration has a propensity to use its executive powers to retaliate against and punish politically disfavored individuals**

Particularly during his second term, President Trump doesn't disguise his disdain for those who disagree with him. He openly and repeatedly refers to Democrats and progressives as "radical left scum," "radical left dumacrats," "radical left lunatics," "radical left losers," "radical left monsters," and "radical left thugs."[46] He claims that anyone who disagrees with him, his allies, or his agenda "hate our Country, and everything it stands for."[47] He labels his political opponents "CRIMINALS who will hopefully pay serious consequences for their illegal actions."[48] And he publicly threatens to harness the power of the Executive Branch to punish and retaliate against political dissenters.[49]

But well beyond mere political rhetoric, this administration has repeatedly tried to harness the power of the judicial system to punish its enemies. Dozens and dozens of federal courts across the

---

[46] https://truthsocial.com/@realDonaldTrump/posts/116835372963831103 (blaming reflecting pool damage on "Radical Left SCUM that hate our Country"); https://truthsocial.com/@realDonaldTrump/posts/115987465493616768 (referring to Kristi Noem opponents as "Radical Left Lunatics, Insurrectionists, Agitators, and Thugs"); https://truthsocial.com/@realDonaldTrump/posts/112927430293539517; https://truthsocial.com/@realDonaldTrump/posts/114517773720445162; https://truthsocial.com/@realDonaldTrump/posts/114264549657133828; https://truthsocial.com/@realDonaldTrump/posts/115928428222216680.

[47] https://truthsocial.com/@realDonaldTrump/posts/114372349322321344 (Abrego); https://truthsocial.com/@realDonaldTrump/posts/114436142904738936 (Democrats; Impeachment; Adam Schiff); https://truthsocial.com/@realDonaldTrump/posts/116290528260288417 (The Radical Left, Country Hating Democrats"); https://truthsocial.com/@realDonaldTrump/posts/114982081738276986 (referring to Democrats as "country hating THUGS").

[48] https://truthsocial.com/@realDonaldTrump/posts/115215588649960500; https://truthsocial.com/@realDonaldTrump/posts/115209549037822166 (claiming that "Democrats love CRIME")

[49] https://truthsocial.com/@realDonaldTrump/posts/115239044548033727 (directing Bondi to pursue retaliatory criminal charges against former FBI Director James Comey and New York Attorney General Leticia James); days later, federal indictments followed (*see* https://time.com/7319161/trump-pam-bondi-letitia-james/ ("Trump Urges Pam Bondi to Prosecute His Political Opponents: 'Justice Must Be Served'").

country have ruled that this administration intentionally wielded its executive powers in bad faith and overtly unconstitutional, retaliatory, and politically discriminatory ways.[50] Many of these rulings were made in the context of federal criminal cases specifically, including cases in which courts granted discovery for selective or vindictive prosecution motions, and/or dismissed indictments for Fifth Amendment or other constitutional violations. *See, e.g.*, *United States v. Petrova*, 2026 WL 892470, at \*6-7 (D. Mass. Apr. 1, 2026) (ordering discovery where defendant produced "some evidence" suggesting that the only reason she was charged with a felony for failing to declare frog embryos at customs "was her status as the holder of a J-1 visa who was studying at Harvard"); *United States v. Carey*, 816 F. Supp. 3d 129, 144 (D.D.C. 2026) (ordering discovery where defendant "easily" produced "some evidence" showing "that he would not have been prosecuted but for his protected speech"); *United States v. Abrego Garcia*, --- F. Supp. 3d ----, 2026 WL 1454303, at \*12 (M.D. Tenn. May 22, 2026) (published) (dismissing indictment on vindictive prosecution grounds after ordering discovery, ultimately finding that the evidence "sadly reflects an abuse of prosecuting power"); *United States v. Quintanilla-Chavez*, 807 F. Supp. 3d 641, 671 (W.D. Tex. 2025) (dismissing indictment on Fifth Amendment grounds, ruling it "represents the rare case in which the Government's conduct is so 'shocking to the universal sense of justice' that it should be deprived of the opportunity to prosecute the Defendant"); *United States v. Comey*, 810 F. Supp. 3d 768, 781 (E.D. Va. 2025) (dismissing indictment based on government's unlawful exercise of executive power under Appointments Clause); *United States v. James*, 810 F. Supp. 3d 752, 767 (E.D. Va. 2025) (same). As one court colorfully characterized an unconstitutional executive order: it "shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished!" *Wilmer Hale v. Exec. Off. of President*, 784 F. Supp. 3d 127, 151 (D.D.C. 2025).

---

[50] https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/; *see also Fed. Educ. Assoc. v. Trump*, 795 F. Supp. 3d 74, 89 (D.D.C. 2025) (listing dozens of cases).

24

The Court should consider all of these judicial findings as probative of the administration's propensity to use its executive powers to intentionally discriminate against politically disfavored individuals. *Cf. United States v. Guardia*, 135 F.3d 1326, 1331 (10th Cir. 1998) (explaining that propensity evidence of wrongful conduct "has indisputable probative value").

### 2. Public admissions by Executive Branch officials demonstrate that this prosecution too was motivated by political animus

Here, statements by President Trump and other Executive Branch officials strongly suggest—if not directly establish—that political animus infected this prosecution as well.

To start, President Trump expressly blamed anti-Tesla vandalism on members of the opposing political party, labeling it "an act of domestic political terrorism against one of [his] allies" because it was being funded "by people who are very highly political on the left." White House staff likewise claimed that the "heinous acts of violence against Tesla by radical Leftist activists are nothing short of domestic terror." Thereafter, the Attorney General publicly announced the administration's intent to pursue anyone involved in *any degree* of anti-Tesla vandalism, publicly declaring: "If you're going to touch a Tesla, go to a dealership, do anything, you better watch out because we're coming after you. And if you're funding this, we're coming after you." And officials indiscriminately threatened everyone in this group with the same, draconian retribution plan: that they would "go through hell," "face the full force of the law," and suffer "severe consequences," including no access to plea negotiations and 20-year sentences in El Salvadorian prisons.

Ever transparent about their motives, President Trump and AG Bondi also explained *why* this group of people, regardless of the individual facts or circumstances involved in each case, would universally face such an extreme prosecutorial response for their conduct. In the administration's view, these "radical left" Tesla vandals earned "20 year jail sentences *for what they are doing to Elon Musk and Tesla*." As Attorney General Bondi put it: "they are trying to weaponize against Elon Musk and we are not going to let that happen." Through these direct admissions, Executive Branch officials expressly

25

revealed the administration's intent to federally prosecute Tesla vandalism for a constitutionally impermissible reason—i.e., to punish these specific defendants for targeting a political ally and supporting a disfavored political cause.

In the starkest of contrasts, the administration's statements about and treatment of the January 6 rioters are instructive. On January 6, 2021, following claims by President Trump that the November 2020 election was "'rigged' and stolen,'" "a large crowd of [his] supporters—including some armed with weapons and wearing full tactical gear—marched to the Capitol and violently broke into the building to try and prevent Congress's certification of the election results." *Trump v. Thompson*, 20 F.4th 10, 18 (D.C. Cir. 2021). It "marked the most significant assault on the Capitol since the War of 1812." *Id.* at 18-19. "Police officers were attacked with chemical agents, beaten with flag poles and frozen water bottles, and crushed between doors and throngs of rioters." *Id.*

Before his second term, President Trump repeatedly referred to the individuals prosecuted for these crimes as "unbelievable patriots," "hostages," "warriors," "victims," and "wrongfully imprisoned."[51] And these comments weren't just political rhetoric, either. On his very first day in office, President Trump signed a proclamation to "end[] a national injustice" by pardoning, commuting the sentences of, and dismissing with prejudice all pending charges for all January 6 defendants.[52] Explaining his decision, President Trump declared that "these were people that actually love our country[,]"[53] and that their lives were "taken away from them unnecessarily and unfairly[.]"[54]

---

[51] https://www.youtube.com/watch?v=N1Eo2jp6QI8 ("hostages, they've been treated terribly, very unfairly", "The first day we get into office… treat those "unbelievable patriots"); https://transcripts.cnn.com/show/acd/date/2024-06-10/segment/01; https://truthsocial.com/@realDonaldTrump/posts/112079753989223875.

[52] https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/.

[53] https://www.pbs.org/newshour/politics/watch-trump-discusses-pardoning-jan-6-rioters-in-first-news-conference.

[54] https://www.nbcnews.com/politics/donald-trump/live-blog/trump-davos-hannity-interview-jan-6-pardons-live-updates-rcna188606 (video).

District courts that presided over these prosecutions, however, adamantly disagreed with these claims. *See, e.g.*, *United States v. Warnagiris*, No. CR 21-0382 (PLF), 2025 WL 341990, at *4 (D.D.C. Jan. 30, 2025) ("The Proclamation's assertion is factually incorrect. There has been no 'grave national injustice.'"); *United States v. Banuelos*, 763 F. Supp. 3d 1, 2 (D.D.C. 2025) ("no pardon can change the tragic truth of what happened on January 6, 2021"); *United States v. DeCarlo*, No. CR 21-00073 (BAH), 2025 WL 266308, at *3 (D.D.C. Jan. 22, 2025) ("Having presided over scores of criminal cases charging [January 6] defendants," which were "fully supported by evidence[,] . . . this Court cannot let stand the revisionist myth relayed in this presidential pronouncement.").

Only a few weeks later, President Trump drew a direct comparison between Tesla-vandalism defendants, a small handful of people who committed varying degrees of actual and attempted property damage to car dealerships owned by a private company, and the January 6 defendants, who participated in a mass "rampage [that] left multiple people dead, injured more than 140 [law enforcement officers], and inflicted millions of dollars in damage," *Thompson*, 20 F.4th at 15, 19. President Trump explained: "I view these [Tesla defendants] as terrorists . . . you didn't have that on January 6, I can tell you. You didn't have anything like that on January 6."[55]

3. **This administration has intervened in this case to control decisions and revoke the Colorado USAO's usual authority to negotiate below the mandatory minimum**

Just like President Trump's public promises to "free the January 6 hostages," he's upholding his public promise to make Tesla vandals "go through hell" too. As explained above, AUSAs in this district historically have discretion to drop arson charges carrying mandatory minimum sentences in exchange for a guilty plea—even when defendants have caused significant property damage or have

---

[55]  https://abc7ny.com/post/donald-trump-calls-tesla-vandalism-suspects-terrorists-compares-actions-jan-6-vowing-send-el-salvador-prisons/16063808/.

prior felony convictions. That happened twice in recent months. And that option appeared to be on the table here too, at least initially.

On March 3, 2025, in her very first email to defense counsel about Ms. Nelson, the AUSA assigned to this case expressed that she would "love to talk" about the possibility of an "early resolution." But everything changed after President Trump and Attorney General Bondi publicly threatened to seek 20-year sentences and refuse to engage in any negotiation in all Tesla-related cases. The usual discretion and negotiating authority traditionally extended to Colorado AUSAs to offer resolutions below the mandatory minimum arson charge had been revoked by Main Justice. As the assigned AUSA explained, she had "no authority" to engage in any settlement negotiations, and was instead ordered by Main Justice "to reject any defense counsel offers on these Tesla cases." She instructed defense counsel to send any further negotiation requests to Main Justice directly—an extremely unusual, if not utterly unprecedented, procedure in this district. *See* Exhibits C, D, E.

These communications provide compelling evidence of the administration's discriminatory intent. They show that the administration intervened to exercise direct control over prosecutorial decisions in this case and remove all discretion ordinarily afforded to local prosecutors in this district. *See United States v. Haggerty*, 528 F. Supp. 1286, 1294 (D. Colo. 1981) (finding "a compelling prima facie case of selective prosecution" where DOJ "retained greater control over both the prosecutorial and negotiating processes" by "removing the prosecutorial discretion of the local United States Attorney's office"). They prove that the DOJ has opted to ignore all case-specific factors that ordinarily drive the exercise of prosecutorial discretion, such as a defendant's criminal history, her degree of culpability, and her willingness to accept responsibility for her actions. And it shows that the DOJ took active steps designed to adversely affect "an identifiable group," *Wayte*, 470 U.S. at 610. Because Ms. Nelson's prosecution was one of "these Tesla cases," her fate was predetermined. As promised, she would have no chance at leniency or negotiation, and no choice but "to face the full force of the law."

28

**E. The Court should order the government to produce discovery relevant to the selective prosecution claim**

Ms. Nelson has easily cleared the bar to show "some evidence" to show the existence of discriminatory effect and discriminatory intent. Accordingly, the court should order the government to produce relevant discovery. Ms. Nelson submits that relevant discovery should include, at minimum:

1. All documents, media, or communications in the possession or control of the government[56] that relate to the charging decisions and plea negotiations of Tesla-related cases from January 2025 to present. These items should include all documents and electronically stored information and communications, including emails, text messages, and other mobile device communications, and well as any audio or video recordings, social media posts, and online chat messaging.
2. Any documents or communications in the possession or control of the government regarding any formal or informal administrative priorities, policies, or practices related to arrests and prosecutions of individuals alleged to have committed federal offenses involving Tesla. This request includes, but is not limited to, internal communications, media statements, and/or memoranda. This request also includes any communication that in any way refers to the alleged offenders' political or policy views, or political affiliation or party.
3. Any documents and communications involving any Department of Justice official and staff, White House official and staff, federal law enforcement, or other Trump administration officials or advisors that have referenced Ms. Nelson, including in the context of affecting arrest and prosecution.

Ms. Nelson also moves for an order directing the United States Attorney's Office for the District of Colorado to inform and direct all agents and officers of the FBI and ATF who were involved in the investigation of Ms. Nelson to preserve the items listed above.

**Conclusion**

Ms. Nelson satisfies the threshold "some evidence" standard to compel discovery, and she satisfies the prima facie, "clear evidence" standard to shift the burden of proof to the government to disprove its discriminatory intent. Accordingly, the Court should compel the government to produce

---

[56] As used in these requests, the term "government" intends to encompass members of the Department of Justice (including the Attorney General, Deputy Attorney General, Associate Attorney General, the Assistant Attorney General for the Criminal Division and members of their staffs), White House staff, the United States Attorney's Office for the District of Colorado, the Federal Bureau of Investigation (FBI), and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

discovery relevant to Ms. Nelson's selective-prosecution claim, order an evidentiary hearing on the motion, and, ultimately, dismiss the indictment with prejudice.

Respectfully submitted,

MATTHEW K. BELCHER
Interim Federal Public Defender


*s/ Mary V. Butterton*
MARY V. BUTTERTON

*s/ Stephanie Snyder*
STEPHANIE SNYDER

Assistant Federal Public Defenders
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Mary_Butterton@fd.org
Stephanie_Snyder@fd.org
Attorneys for Lucy Grace Nelson

## CERTIFICATION RE: USE OF GENERATIVE ARTIFICIAL INTELLIGENCE ("AI')

Per the Court's Standing Order regarding the use of Generative Artificial Intelligence ("AI") in court filings, all individuals who contributed to the drafting of this filing certify that generative artificial intelligence was not used to draft this document.

*s/ Mary V. Butterton*
MARY V. BUTTERTON

*s/ Stephanie Snyder*
STEPHANIE SNYDER

*s/ Amy Senia*
AMY SENIA


Assistant Federal Public Defenders

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2026, I filed the foregoing **Motion to Dismiss the Indictment for Selective Prosecution and Motion to Compel Selective-Prosecution Discovery** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Cassandra J. Wiemken, Assistant United States Attorney
Email: cassandra.wiemken@usdoj.gov

Adam D. McConney, Assistant United States Attorney
Email: adam.mcconney@usdoj.gov

Bryan Fields, Assistant United States Attorney
Email: bryan.fields3@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Lucy Grace Nelson (via U.S. mail)

*s/ Mary V. Butterton*
MARY V. BUTTERTON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Mary_Butterton@fd.org
Attorney for Lucy Grace Nelson
