IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 25-cr-00075-NYW

UNITED STATES OF AMERICA,

Plaintiff,

v.

LUCY GRACE NELSON,

Defendant.

---

**MOTION TO SUPPRESS EVIDENCE**

---

**Introduction**

Imagine that you're stopped at an intersection on the way to work. As you glance in your rearview mirror, you see a man in the car behind you with his cell phone raised, taking a photo of the back of your car. Perhaps he thinks your bumper sticker is clever. Perhaps he didn't realize your car's manufacturer had released a new electric model. Or perhaps he's just a creep. But as you drive off, he does too, and you don't think about it again. After all, these fleeting encounters happen when people are in public. We don't expect unassailing privacy every moment we spend on public roads.

But a month later, you see the man again. This time he approaches you and asks, "The third Tuesday of last month, do you know where you were at 8:09 p.m.?" You pause, horrified and stunned. And, also, you have *no idea* where you were on the third Tuesday of last month. Before you can respond he says, "You were at the women's clinic in Broomfield. You spent nearly two hours there. Did everything go ok?" He continues: "Also, you usually work from home on Wednesdays, but last week you went into the office, why is that?" He won't stop: "I'm sorry that you couldn't meet your friends for your regular tennis match on Saturday morning—I'm sure Justine in her silver 4Runner, Sarah in her blue Subaru, and Camille in that sporty green Mini Cooper hated playing without you." And then:

"Oh and before I forget, when you brought your kids to the park the other week, I thought that pink hoodie you were wearing looked really nice on you."

This time around, the man's behavior is so universally unacceptable and socially outrageous that he would face arrest in every state for criminal stalking or harassment. Yet law enforcement, with the click of a button and a paid subscription to Flock Safety's AI surveillance technology, can uncover this exact same type of highly personal information about nearly any driver nationwide.

Fortunately, courts have long been attuned to the reality that, as "[s]ubtler and more far-reaching means of invading privacy have become available to the Government," they must be vigilant to ensure that the "progress of science" does not erode Fourth Amendment protections. *Olmstead v. United States*, 277 U.S. 438, 473-74 (1928). Here, the progress of science has afforded law enforcement a powerful new tool to carry out its important responsibilities. At the same time, this tool risks government encroachment of the sort the Framers, "after consulting the lessons of history," drafted the Fourth Amendment to prevent. *Carpenter v. United States*, 585 U.S. 296, 320 (2018). Indeed, a central aim of the Framers was "to place obstacles in the way of a too permeating police surveillance." *United States v. Di Re,* 332 U.S. 581, 595 (1948).

Ms. Nelson has a cognizable privacy interest in her retrospective and real-time location information, and the government's warrantless search through that information using Flock's AI surveillance system violated the Fourth Amendment. Loveland Police leveraged the power of Flock's technology to invade Ms. Nelson's privacy rights in a manner that required advance authorization from a neutral and detached judicial officer. Because no warrant authorizing this infringement was either sought or obtained, this Court should suppress all fruits of this warrantless search and unprecedented surveillance, including items recovered following the subsequent search and seizure of Ms. Nelson's person, home, and vehicle.

## Statement of Facts

Most people have heard of automated license plate readers (ALPRs). But Flock Safety's breathtakingly powerful AI surveillance technology is not your mother's ALPR. Its systems have effectively revolutionized modern policing, allowing police to effortlessly collect, search, and analyze an unprecedented amount of highly personal and private information about drivers (and more) nationwide. (*See* Ex. A, Keener Affidavit.)

### A. Flock's AI technology creates a modern-day surveillance state

Flock Safety is a private company that leases physical cameras and surveillance software to law enforcement agencies, local municipalities, private businesses, and homeowners' associations—working with these groups to place cameras in strategically targeted areas. All told, Flock owns and operates more than 120,000 fixed cameras, mobile cameras, pan-tilt-zoom cameras, and drone-equipped cameras across the country.[1] But you won't find that number, or a nationwide map revealing each of its camera locations, on Flock's website. Instead, this figure comes from DeFlock.org, an independent, open-source project that maps Flock's (and other company's) surveillance cameras nationwide based on public records requests, other publicly available documents, and individuals who spot these cameras in their communities.[2] In an interview last year, Flock's CEO called DeFlock a "terrorist" organization. (He later apologized.)[3]

Flock's AI-equipped cameras capture images of every passing vehicle, allow police to stream live video feeds, and, depending on the type of camera, can even follow and record individual people who walk past. (Ex. A, Keener Aff., § III(7).) Flock's cameras automatically take several high-resolution images every time it detects a license plate passing by—hence the automated-license-plate-

[1] https://deflock.org/
[2] *Id.*
[3] https://gizmodo.com/flocks-ceo-is-sorry-for-calling-privacy-activists-terrorists-2000787247

reader (ALPR) catchall name. (*Id.*, § III(2).) But those images capture the entire car, not just the license plate. (*Id.*) When sunlight is strong and visibility is good, these images can be clear enough to see the inside of passing cars—capturing images of drivers and passengers, along with what clothing they're wearing. (*Id.*, § IV(3); *see also* Ex. B.)[4] And, of course, these cameras also record the exact geographic coordinates of each passing vehicle, along with the precise time and date it passed. (Ex. A, Keener Aff., § IV(3).) Immediately after capturing all of this information, Flock's hardware automatically uploads it into Flock's centralized cloud system. (*Id.*, § III(3).) Every month, Flock captures and uploads approximately 20 billion unique vehicle scans nationwide. (*Id.*, § IV(1).)

But Flock's hardware isn't what makes its surveillance services revolutionary; it's the software. Police have long used relatively unsophisticated ALPRs to track drivers for various routine or ministerial purposes, such as collecting tolls or spot-checking driver registration compliance. Compared to Flock's cutting-edge surveillance technology, these more traditional ALPR systems look like governmental child's play.

Using the latest and greatest in artificial intelligence and machine learning technology, Flock's software extracts far more than just license plate information from each of the 20 billion images its camera systems take each month. It generates a unique "vehicle fingerprint" on every passing car: creating an individual profile that logs the car's license plate, registered owner, make, model, color, and any distinct features, such as decals, bumper stickers, roof racks, after-market wheels, and unique dents, scratches, or other body damage. (Ex. A, Keener Aff., § III(2).) In layman's terms, that means that Flock's system discovered the ding in the right bumper of your car before your spouse did. It means that Flock's system knew you waited well into June to change out your snow tires. It means that Flock's system knows that you believe we should "Tax the Rich," that you "Support Planned

[4] Because of the paywall on this article, undersigned counsel has attached it as an exhibit for the Court's convenience.

Parenthood," and that you've memorized the first three words of the Constitution ("We the People"). Flock also enables police departments to integrate other types of surveillance tools, such as intersection traffic cameras or public feeds, creating an interface that allows police to seamlessly track people's comings and goings through a variety of different systems.

One feature of Flock's "vehicle fingerprint" technology is that it allows police to monitor driver moments and locations even when its cameras fail to capture a car's license plate information—if, for example, a camera's snapshot catches only a fragment of a car as it turns, or as a truck simultaneously drives by and partially obscures the camera's view, or if someone's front or back license plate is missing. (Ex. A, Keener Aff., § III(2),(11).) And it also means that police can run an extremely broad plain-text search to find a car and its driver even without knowing its license plate information. (*Id.*) Entering a query no more detailed than "blue SUV roof rack," police can find every vehicle at a designated time and/or place matching this description, and, accordingly, find every owner of every vehicle matching this description. Police can then trace the retrospective movements of these owners, determine where these owners frequently go, and use Flock's algorithmic pattern recognition tools to obtain a list of other drivers these owners frequently "associate" with (i.e., drive near), and predict where and when those vehicles might drive next. (*Id.*)

Of course, whenever police run that type of vague query, it means that police have now searched through the location information of *all* of these people—including the 99.99% (or more) of them who did nothing to warrant any kind of police suspicion. And because Flock's database is searchable nationwide, it means that law enforcement agencies can access this type of highly-detailed driver information all over the country—including for cars and drivers outside of their jurisdiction.

Police have harnessed Flock's AI surveillance technology to, for example, find people who traveled to political protests, track women who drove out of state to obtain an abortion, and identify

attendees at certain religious services. (Ex. A, Keener Aff., § IV(3).)[5] Police have used Flock to stalk their spouses and exes. (*See* Ex. B.) Rife with the potential for abuse, and ever-expanding, it is also telling that the only people who have the ability to opt out of Flock's retrospective, real-time, and predictive policing surveillance infrastructure, are the police themselves. Officers can place themselves and their families' vehicles on "whitelists" or safelists, ensuring that their own movements are not tracked as they monitor everyone else's.

In sum, Flock allows the police to research, sort, and analyze the massive amount of data that is captured in 20 billion images per month in a way never before possible. An army of police officers, stationed on every street corner in America, simply could not do by hand what Flock's sophisticated AI and machine learning systems accomplish with only the click of a button.

**B. Loveland Police use Flock's AI surveillance system to identify and track Ms. Nelson**

On January 29, 2025, at around 6:35 p.m., the Loveland Police Department (LPD) received a call about a small fire at a closed Tesla car dealership. The responding officer saw a glass beer bottle with a rag inside that smelled of gasoline, but no damage to any vehicles or property. On February 8, 2025, the morning after a second incident at the same Tesla dealership, LPD officers and federal agents arrived to find several cars vandalized with spray paint and four broken beer bottles and charred rags littered throughout the outside parking lot, but no damage caused by fire.

Loveland PD began collecting surveillance footage from surrounding businesses, private residences, and city traffic cameras. Eventually, a silver Toyota Prius driving out of a Walgreens parking lot—down the street from the vandalized Tesla dealership—on the night of February 7 caught their attention.

[5] *See also, e.g.*, https://www.usnews.com/news/u-s-news-decision-points/articles/2026-07-28/get-the-flock-outta-here-backlash-grows-over-video-surveillance-tool.

On February 13, police pulled footage from city traffic cameras on February 7 and tracked the Toyota Prius as it drove out of the Walgreens parking lot and down the road until it passed one of Loveland's Flock cameras stationed on a main thoroughfare. Only then were police able to identify a potential license plate number for that Prius, since Loveland's standard traffic cameras are too low-resolution to pick up such details. But Flock's first plate scan misread a digit—a fact police didn't discover until a few days later when they pulled the image and looked at it themselves. In the meantime, at least six different LPD officers used that incorrect license plate (EGA266) to run two dozen Flock queries and track the wrong car's past locations, each query searching tens of thousands of cameras across the country. With Flock's software at hand, police were able to discover instantaneously how many times that car – with the wrongly identified plate - had been in the area for the past 30 days and were able to map its journey.[6]

Once officers discovered the correct plate number for the Prius that they intended to identify, they entered that number into Flock's nationwide database, learned that the car was registered to Justin Nelson in Lyons, Colorado, and ran 22 more queries to track that car's past locations and movements.[7] Officer Gladu then "cross-referenced" this information in "open source databases," discovered that Justin Nelson had changed her name to Lucy Grace Nelson, and found Ms. Nelson's Facebook page. Officer Gladu searched through four years of content to find a May 2021 post in which Ms. Nelson came out as a transgender woman, and, for some reason, chose to transcribe the specific details of that post in his official police report. Officer Gladu then sent preservation letters to Meta for Ms. Nelson's Facebook records.

That night, three police officers went to Ms. Nelson's home and flew a drone over her residence, observing through its camera feed that a silver Prius with no plates had slid into a nearby

---

[6] *See* Ex. C, Flock Investigative Summary, 2/13/2025 (INV_1907 – 1909).
[7] *See* Ex. D, Loveland PD Audit, EGAZ66, February 2025 (INV_2541).

ditch. Undeterred, various officers with the LPD continued using Flock's retrospective capabilities to track Ms. Nelson's movements (and the movements of a handful of other random people around the country who happened to have a similar license plate number) both inside and outside of Loveland over the previous 30 days. Between February 13 and February 25, 2025, Loveland Police officers used Flock's software to retrospectively trace Ms. Nelson's movements (using EGA266 and EGAZ66) at least 135 times.[8]

Detective Zach Noble also created at least eight "hotlist" entries in Flock's system, meaning that he and other Loveland police officers would receive a real-time alert to their cell phones every time Ms. Nelson's vehicle entered Loveland. He also put the cars of Ms. Nelson's mother, sister, brother-in-law, and niece on the hotlist, opting to receive real-time location information about Ms. Nelson's family too.[9]

On February 24, 2025, LPD Detective Zach Noble was off duty and home around 9:20 p.m. when he received a Flock hotlist alert on his cell phone, informing him that Ms. Nelson's silver Prius had just passed a Flock camera near Loveland. He texted other detectives, and the LPD surveilled the silver Prius as it drove around Loveland. Officers observed Ms. Nelson exit her car, walk across the Tesla parking lot, and—after committing no offense—return to her car. Officers stopped her car, arrested her, and thereafter acquired warrants to search her home and vehicle.

On February 25, 2025, after Ms. Nelson's arrest, LPD Officers repeatedly searched through Flock's system to locate and recreate a detailed map of her movements over the past month. Detectives sifted through thousands of results and saved more than a hundred images—including multiple shots of a black SUV in Michigan, a white sedan in Montana, a red SUV in Iowa, and Ms. Nelson's Prius traveling throughout Lyons and Boulder, Colorado. The next day, after Ms. Nelson

---

[8] Ex. D; Ex. E, Loveland PD Audit, EGA266 (INV_2540).
[9] Exhibit F, Hotlist Information from Event Logs (INV_2306).

was released into the community, LPD tracked her down again using the hotlist alerts on her mother's car, and re-arrested her on the federal warrant. And the Flock searches didn't end with Ms. Nelson's arrest, either—after she was arrested and released on bond, police continued to use Flock to track and monitor her whereabouts.[10]

At no point during Loveland's investigation did Ms. Nelson subjectively expect police, by way of Flock AI surveillance technology, to track her physical location and movements. Instead, she expected this information, and the intimate details of her life that it revealed, to remain private.

## Argument

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "basic purpose" of this Amendment "is 'to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Chatrie v. United States*, 146 S. Ct. 2193, 2204 (2026) (quoting *Carpenter v. United States*, 585 U.S. 296, 303 (2018)). Indeed, the Supreme Court has long held that "the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures." *Katz v. United States*, 389 U.S. 347, 353 (1967). Accordingly, when government agents intrude upon a privacy interest that "society is prepared to recognize as reasonable," that "intrusion into that private sphere generally qualifies as a search" under the Fourth Amendment "and requires a warrant supported by probable cause." *Carpenter*, 585 U.S. at 304.

### I. Police conduct a Fourth Amendment search by using Flock AI surveillance technology to track an individual's physical location and movements

"Whether an expectation of privacy counts as legitimate is less the result of any fixed set of rules than of 'guideposts' stretching back to the Fourth Amendment's beginnings." *Chatrie*, 146 S. Ct. at 2205. Starting in the Founding Era through today, "the Fourth Amendment has sought to secure

[10] Ex. D.

the 'privacies of life' against the exercise of 'arbitrary power.'" *Id.* The Supreme Court has thus "recognized, and repeatedly, that the Amendment was designed to place obstacles in the way of a too permeating police surveillance." *Id.*

Accordingly, while "innovations in surveillance tools" have "enhanced the Government's capacity to encroach upon" closely held aspects of people's lives, the Fourth Amendment remains static in its guarantee of the same "degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.*; *Carpenter*, 585 U.S. at 305. It is up to the courts, then, to strenuously resist any "mechanical interpretation[s]" of the Fourth Amendment that leave people "at the mercy of advancing technology." *Carpenter*, 585 U.S. at 305 (citing *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). And that is true not only for "sophisticated systems that are already in use" by police, but also those technologies that are currently "in development" and "rapidly" improving. *Id.* at 313. As the Supreme Court just reaffirmed, "new technology should not transform what individuals had reasonably thought they could withhold from the Government." *Chatrie*, 146 S. Ct. at 2207.

**A. The Supreme Court has recognized a reasonable expectation of privacy in an individual's physical location and movements**

Applying the Fourth Amendment in the context of various technological innovations in police surveillance, the Supreme Court in recent years has repeatedly recognized that individuals have a reasonable expectation of privacy in their past physical location and movements—even when traveling in public.

In *United States v. Jones*, 565 U.S. 400 (2012), a five-Justice concurrence ruled that police conducted a Fourth Amendment search by using a GPS device to track an individual's vehicle over several weeks, reasoning that individuals have a reasonable expectation of privacy over their "physical locations and movements," even when those movements "occurred in public." *Chatrie*, 146 S. Ct. at 2206 (citing *Jones*, 565 U.S. at 429). "Prior to the digital age, pursuing a suspect for any extended period

of time was difficult and costly and therefore rarely undertaken." *Id.* at 2206-07. Accordingly, these concurring Justices explained, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car." *Id.* at 2207 (citing *Jones*, 565 U.S. at 430). If left constitutionally unchecked, this new GPS technology —"by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the government, in its unfettered discretion, chooses to track"—had the capacity to "alter the relationship between citizen and government in a way that is inimical to democratic society." *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring).

Echoing these themes a decade later in *Carpenter*, the Court held that a cell phone user has "a legitimate expectation of privacy in the record of his physical movements as captured through" cell-site location information (CSLI). 585 U.S. at 310. In reaching this conclusion, the Court emphasized that with CSLI, law enforcement "need not decide in advance (as they do with GPS devices) who they want to follow and when. Instead, they can easily and cheaply—with 'just the click of a button'—reconstruct any person's movements 'retrospectively.'" *Chatrie*, 146 S. Ct. at 2207 (quoting *Carpenter*, 585 U.S. at 311-12). That feature was significant for privacy purposes, the Court explained, because it meant that "this newfound tracking capacity runs against everyone," not just those already "under investigation" by police. *Id.* And it didn't matter that CSLI was "less precise than GPS information," and thus, could reveal an individual's physical location only within a sector "ranging from one-eighth to four square miles." *Carpenter*, 585 U.S. at 312. Because CSLI allowed police to, "in combination with other information, deduce a detailed log of [an individual]'s movements," the Fourth Amendment labels it a search. *Id.* This type of effortlessly compiled, indiscriminate, detailed, and retrospective location information—which was historically "unknowable" to law enforcement officials—"presente[d] formerly unimaginable privacy concerns." *Id.*

And just last month in *Chatrie*, the Supreme Court held that "an individual has a legitimate expectation of privacy in the information [Google] Location History collects about his cell phone's—meaning his own—movements," an expectation that police invade "when they acquire that information, even though for only a limited period of time[.]" 146 S. Ct. at 2206-07 (police obtained warrant for "only two hours" of the defendant's physical location in a circumscribed area surrounding a bank robbery). *Chatrie* explained: "repeated patterns . . . are not all that individuals wish to, and reasonably expect to, keep to themselves." *Id.* at 2210. "Even short-term monitoring of a person's physical movements can provide a wealth of detail about [his] familial, political, professional, religious, and sexual associations." *Id.* And "unlike" the GPS device in *Jones*, the Court pointed out, Location History "allows officers to target one-off events of potential interest: a gun show, say, or a political rally"—and "to see, in a given time block, who shows up." *Id.*

*Jones*, *Carpenter*, and *Chatrie* thus collectively recognize that individuals have a reasonable expectation of privacy in records of their physical location and movements—even when they venture out into public and even when they're monitored by police for only short windows of time. That was true when police employed a GPS device to track an individual's car on public trips over several weeks; when police obtained a cell phone user's CSLI as he traveled in public and private spaces over several days; and when police acquired a Google user's Location History data near a public bank for a two-hour period. And it's also true here, when police searched through Flock's AI surveillance database to ascertain Ms. Nelson's location and movements over the course of several weeks.

**B. Flock AI surveillance invades reasonable expectations of privacy by enabling police to track an individual's location, movements, and more**

Flock's location-tracking technology, if otherwise left unchecked, risks "a too permeating police surveillance," *Chatrie*, 146 S. Ct. at 2205. Because the Fourth Amendment guarantees the degree of privacy that existed during the Founding Era, its protections are triggered where (1) police employ

a surveillance technology that's not generally in public use to reveal historically unknowable information, and (2) that category of information may involve "intimate details" or "private matters" that individuals generally wish to, and reasonably expect to, keep to themselves.[11] Applying those two principles here leads to one inescapable conclusion: police conduct a Fourth Amendment search when they harness Flock's AI surveillance software to track an individual's location and movements because society doesn't expect or willingly tolerate this type of deeply personal intrusion.

### 1. Flock's AI surveillance system is not in general public use and allows police to obtain historically "unknowable" information

As set forth above, police conduct a Fourth Amendment search when they employ surveillance technology "not in general public use" to obtain location information that would've been "unknowable" before the digital age. *Kyllo*, 121 U.S. at 34; *Chatrie*, 146 S. Ct. at 2207; *Carpenter*, 585 U.S. at 312. And that's exactly what happens every time an officer logs into Flock's proprietary AI system to track an individual's past locations, to find his current location, to predict his future movements, or to discover his routines, patterns, associates, and more.

Unquestionably, Flock's technology isn't in general public use. No member of the general public has any (legal) mechanism to, "at the click of a button," discover where his ex-girlfriend celebrated her birthday dinner last week, or whether she visited a health clinic to terminate a pregnancy. (*See* Ex. B.) The fact that the general public lacks access to this technology is important, because it means that society doesn't reasonably expect police to have access to it either—at least not without going through some type of legal process first. (*See infra* at pp. 20-22.)

[11] The Supreme Court in these three cases, likely cognizant that it and other courts are ill-positioned to predict future technological advances in policing, didn't announce any specific multi-factor test, indispensable criteria, or list of checkboxes to tick off when determining whether police use of a *new* surveillance technology invades reasonable expectations of privacy in one's location information. That makes good sense; demanding application of a rigid, inflexible test risks inviting "a mechanical interpretation" of the Fourth Amendment that allows the "power of technology to shrink the realm of guaranteed privacy," *Kyllo*, 533 U.S. at 35, 34.

There's also no doubt that the information police can gather from Flock's AI surveillance technology would have been not only "unknowable" during the Founding Era, but also absolutely unthinkable. *Carpenter* at 312. Historically, as noted in *Jones*, law enforcement didn't have the manpower to surveil any one individual for more than a "brief stretch" of time, much less surveil large masses of people continuously. These practical limitations on policing resulted in a shared expectation that venturing out into the public sphere, even for intimate activities, would remain effectively shielded from the "inquisitive eyes" of the government. There was practical privacy in public life because police simply couldn't keep a watchful eye on everyone, at all times, for any reason, or for no reason at all.

But Flock's capabilities, much like the CSLI collected in *Carpenter*, fundamentally disrupt all of that. Previously, people could go about their private business in public in a largely transitory and anonymous way; now, Flock creates a historical record of those previously ephemeral moments and logs them in a searchable, nationwide police database. The privacy implications of this new technology are numerous and staggering.

To start, the indiscriminate and "retrospective quality" of Flock's data-gathering technology "gives police access to a category of information" that they historically wouldn't have had. *Carpenter* at 312. "In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection. With access to [Flock's nationwide database], the Government can now travel back in time to retrace a person's whereabouts, subject only to the retention policies" and cloud-storage capacities of each Flock-using police department. *Id.* Critically, Flock's system automatically and continually records location information and other data about every single person who drives (or sometimes even walks) by any of its more than 120,000 cameras nationwide. With more than 20 billion unique vehicle scans captured and stored every month, Flock's "newfound tracking capacity runs against everyone"—not just those "persons who might happen to come under investigation[.]" *Id.* And that's significant for privacy purposes because it means that unlike in the past,

now "police need not even know in advance whether they want to follow a particular individual, or when. Whoever the suspect turns out to be, he has effectively been tailed" by Flock for an extended period of time. *Id.*

And unlike other "traditional investigative tools," Flock's technology enables police to do far more than linearly track an individual's past location and movements. Using AI and machine learning, Flock's software conducts various types of pattern recognition that even the most sophisticated mathematician or detail-oriented police officer couldn't manually perform—and certainly not to this scale. Police can use Flock's software to reverse search for vehicles with minimal details or information, meaning that instead of looking for a known suspect's car by license plate number, police can input general terms such as, "blue Honda Civic with broken taillight" to search through thousands of drivers' location information. Some of these features are affirmatively marketed by Flock as aiding so-called "predictive policing" efforts, allowing police to search for vehicle movement patterns in disfavored neighborhoods that they deem suspicious for one reason or another. Police can use Flock's software to ascertain what stores or churches an individual frequently visits. Police can also identify potential members of an individual's social circle, since Flock tracks "associated" cars that its cameras frequently log driving near each other at the same time. Flock's datasets also help police predict, with alarming accuracy, a specific car's most likely path of travel from point A to B based on an individual's historical driving routines and patterns. And they can place any number of individuals on a "hotlist," which alerts designated officers with a targeted individual's real-time location every time she passes a Flock camera.

Flock's technology thus enables police to "effortlessly" track an individual's location information in sweeping, invasive, and historically unprecedented ways. Not even the largest, most capable police force on earth could achieve results on par with Flock's surveillance technology. Even if the government could theoretically devote the manpower—assigning an officer to every street

corner with instructions to record every passing vehicle's license plate information 24 hours a day, 7 days a week—human beings are simply incapable of conducting the sophisticated pattern recognition that Flock's AI software makes available to police "at the click of a button."

**2. Flock's AI surveillance system is capable of revealing deeply personal information that people expect to remain private**

In *Jones*, *Carpenter*, and *Chatrie*, the Court emphasized that the location-tracking technology at issue was capable of revealing personal, intimate details about an individual's life—information that people generally expect to remain private. In *Chatrie*, where the government collected only two hours of the defendant's public location information, the Court highlighted how deeply revealing such information could potentially be: "Consider just a few trips that a person is apt to think 'indisputably private': to 'the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, [or] the by-the-hour motel.'" 146 S. Ct. at 2210. The Court continued by pointing out another revealing capability of area-specific, short-term monitoring: "And unlike a GPS device, Location History enables police officers to focus on precisely those [indisputably private] sites—to see, in a given time block, who shows up. Similarly, Location History—even two hours of it—allows officers to target one-off events of potential interest: a gun show, say, or a political rally." *Id.*

Those capabilities apply with equal force to Flock's location-tracking technology too. Indeed, the fact that Flock's data-gathering cameras exist in only certain locations is a feature, not a bug. Flock allows police and its other institutional clients to choose the exact location for each of its data-gathering cameras, allowing law enforcement to designate specific areas "of potential interest." *Chatrie*, 146 S. Ct. at 2210. That's concerning from a privacy perspective because it allows police "to focus on precisely those sites—to see, in a given time block, who shows up," rather than using CSLI or a GPS tracker to target specific individuals that it already has reason to suspect. Just like the geofencing

practice declared a search in *Chatrie*, where police knew the location of the crime but didn't have any suspects and so sought to obtain the location information for everyone nearby when the crime happened, police can use Flock's database in the same way. With Flock's detailed database, police can reverse-engineer potential targets by identifying everyone who drove (or potentially even walked) past a particular Flock camera at a particular date and time—something that simply isn't possible with more traditional policing tools like traffic or surveillance cameras.

Further, with Flock cameras routinely stationed in or nearby "indisputably private" locations such as health care facilities and abortion clinics, Flock's technology has the capacity to regularly track individuals on trips to and from these places. (Ex. A, Keener Aff. at § III(3).) Worse still, media reports have revealed numerous instances in which police have used Flock's technology to surveil individuals specifically *because of* their activities in those private locations, assisting police in tracking individuals who traveled to mosques, attended "No Kings" political protests, and in one instance, who obtained an abortion.[12] Police have also used Flock data to inaccurately accuse, arrest, and charge innocent people who did nothing but drive by the wrong Flock camera many times.[13]

Moreover, police can glean other highly intimate details about someone by supplementing the information obtained from Flock's database with basic inferences or other available data. *See Carpenter*, 585 U.S. at 312-13 (rejecting "the proposition that inference insulates a search" and evaluating whether the government could, "in combination with other information, deduce a detailed log of Carpenter's movements" based on the CSLI obtained). Police can deduce when "individuals are home and when they are away from home based upon both their daily movement patterns, as well as the real-time alerts when they are passing the Flock cameras." (Ex. A, Keener Aff. at § IV(3)(d).) Police can retrace

---

[12] https://www.gadgetreview.com/a-texas-deputy-searched-83000-flock-cameras-to-track-down-a-woman-who-had-an-abortion.

[13] https://coloradosun.com/2025/10/28/flock-camera-police-colorado-columbine-valley/(police accused innocent woman of package theft using Flock's system to find that she drove by the location of the theft more than 20 times during the relevant time period; as she later proved in court, she had been driving to and from her tailor each time).

essentially every moment of an individual's trip on a given occasion by cross-referencing Flock's data with other integrated surveillance tools such as traffic-intersection videos. (In fact, that's how Loveland Police initially identified Ms. Nelson as a suspect in this case.) And they can "determine an individual's faith based on when and how often they pass cameras that are near places of worship." (*Id.*)

But in many ways, the information that police can obtain from Flock's AI surveillance system is far more revealing than the GPS data in *Jones*, the CSLI in *Carpenter*, and the Location History data in *Chatrie*. In all of those cases, police received plots on a map logging an individual's physical location at various points in time. But Flock's system captures far more information than that. It captures an image or video recording of each passerby, her exact longitude and latitude coordinates at the exact time and date of her passing, her license plate (and thus, her name and address), the physical condition of her car (including any dents or dings or new bumper stickers), and, sometimes, her facial expression, what clothes she's wearing, or whether she's driving with passengers or children in her car. (Ex. A, Keener Aff. at §§ III(2), IV(1)(a); Ex. B.) And Flock's pattern recognition capabilities reveal other private aspects of people's lives too—information that GPS data, CSLI, and Location History data certainly don't capture (or at least not with significant additional police work and investigation). For example, as referenced above, Flock's AI software allows police to—among many other things—discover "associates" in an individual's social circle or predict an individual's most likely future travel.

There are also two other aspects of Flock's system that powerfully demonstrate just how invasive its system is. The first is Flock's "whitelist" feature, which allows police to exempt their personal vehicles and the vehicles of their family members from Flock's surveillance, meaning that any time any of these listed vehicles pass by a Flock camera, the data automatically collected is immediately deleted instead of uploaded into Flock's database. It's telling that when police are given an opportunity to opt out of Flock's watchful eye, they take it. The second is that police officers across

the country have faced criminal charges for misusing Flock to track the physical location of "their wives, their girlfriends, their exes, their exes' new partners or women they wanted to meet." (Ex. B.) The fact that law enforcement officers have been criminally prosecuted for misusing Flock's location-tracking information indicates just how intimate and private that data is; if it gleaned only non-private, routine information already available to the public, one wouldn't expect misuse of that information to be a crime.

* * *

Under the Supreme Court's modern surveillance doctrine, as articulated in *Jones*, *Carpenter*, and *Chatrie*, police conduct a Fourth Amendment search when they use Flock's AI surveillance software to track an individual's location, movements, travel patterns, associates, and more. This new policing technology isn't generally available to members of the public, reveals information that would've been "unknowable" before the digital era, and allows police to uncover potentially deeply private and intimate details of people's lives.

Finally, one unique aspect of Flock's data makes it even more desperately in need of Fourth Amendment protection than the location-information at issue in both *Chatrie* and *Carpenter*. In both of those cases, police acquired information that private companies had collected about their customers for legitimate business purposes, and thus required law enforcement to go through at least some kind of judicial process before turning it over to police for use in a criminal investigation. Here, on the other hand, Flock doesn't operate an unrelated business that incidentally captures evidence of a crime, which law enforcement occasionally chooses to request through established legal channels. Unlike CSLI and Location History information, then, Flock's data exists for one reason only: to help the government spy on its people. Law enforcement thus has direct, unfettered access to this information without even having to ask any third party to turn it over or to follow any official legal processes. Especially because there are currently *zero* obstacles in the way of law enforcement's abuse of Flock's

mass surveillance data network, then, it is all the more important for the Fourth Amendment to intervene and provide one. *See id.* ("[T]he Fourth Amendment protects Americans' long-held conviction that *no government official should have free access* to the most closely kept aspects of their lives.") (emphasis added).

**C. Flock AI surveillance violates social customs and values on privacy**

Flock's comprehensive AI surveillance system invades reasonable expectations of privacy under another metric too: they are wildly unpopular among the general public. Societal norms and values, reflected through social behaviors and trends in local and state legislation, are also relevant considerations in assessing whether an expectation of privacy is objectively reasonable. *See Minnesota v. Olson*, 495 U.S. 91, 98 (1990) (evaluating reasonable expectation of privacy based on "social custom" and "the everyday expectations of privacy that we all share"); *Tennessee v. Garner*, 471 U.S. 1, 15-18 & n.21 (1985) (looking to state law trends and rules to evaluate "the reasonableness of police procedures under the Fourth Amendment").

Last week, CNN published an article describing growing public outrage about Flock's AI surveillance system: "people have cut down [Flock] cameras . . . with an electric saw in upstate New York, thrown paint on them in Oakland, California, and rammed a truck into them in Idaho. One man in Florida sits in a lawn chair holding up a piece of cardboard on a pole to block the camera's view."[14] When police in one small town were puzzled to find that their Flock cameras hadn't logged any recent activity, they drove to physically inspect the cameras and discovered that "every metal pole had been cut near the base, left lying in the weeds like felled saplings."[15] Another online joke about

[14] https://www.cnn.com/2026/07/30/us/flock-camera-vandalism-protests-cec.

[15] https://www.gadgetreview.com/someone-cut-down-every-single-flock-camera-in-this-town-in-a-single-night

Flock, intended to encourage people to remove and pillage the machines, became so popular that Google's AI overview repeated it as fact—its cameras contain valuable metals like gold and copper.[16]

But people aren't just complaining about Flock's mass surveillance system; they're encouraging legislators to do something to stop it. Local governments across the country have canceled contracts with Flock in response to strong community opposition and privacy concerns.[17] (Unfortunately some of these governments, such as Denver's city council, missed the point entirely by thereafter signing contracts with Flock competitors.)[18] Other local governments have responded by proposing or passing legislation to regulate law enforcement use of Flock and other AI camera-surveillance systems in their jurisdictions.[19] Just two days ago, the ACLU published an article on its "Get the Flock Out!" initiative, a campaign designed to help people organize in their communities and pass legislation to "fight creepy ALPR cameras" and stop mass surveillance.[20]

In combination, these trends in community organizing, enacted or proposed legislation, and general discontent with Flock's AI surveillance system reflect "public attitudes" toward the expectation of privacy in their everyday location and movements, *see Jones*, 565 U.S. at 429 (Alito, J., concurring in the judgment), and make it reasonable for individuals to expect that this information must remain private.

## II. The warrantless use of Flock AI surveillance violated the Fourth Amendment, and thus, all fruits from that search must be suppressed

[16] https://gizmodo.com/googles-ai-search-reportedly-told-users-that-flock-cameras-are-a-goldmine-2000794890
[17] https://www.newsweek.com/map-cities-rejected-deactivated-flock-cameras-12253499; https://deflock.org/council#wins.
[18] https://www.aclu-co.org/news/denver-city-council-approves-new-axon-contract-to-replace-flock-despite-community-concerns-and-calls-for-a-no-vote/
[19] https://www.ncsl.org/technology-and-communication/automated-license-plate-readers-state-statutes (last updated 2022); https://www.newsfromthestates.com/article/state-lawmakers-propose-guardrails-limit-sharing-license-plate-camera-data (legislators have proposed nearly 100 pieces of legislation on ALPR systems)
[20] https://www.aclu.org/campaigns-initiatives/get-the-flock-out

As set forth above, Loveland Police conducted a warrantless Fourth Amendment search when they acquired Ms. Nelson's historical and real-time location information by using the Flock AI surveillance database. That warrantless search, "undertaken by law enforcement officials to discover evidence of criminal wrongdoing," was presumptively unreasonable under the Fourth Amendment. *Carpenter*, 585 U.S. at 316. Here, unlike in both *Carpenter* and *Chatrie*, law enforcement made no effort to obtain these records lawfully. *See id.* at 317 (government obtained CSLI records pursuant to court order issued under Stored Communications Act); *see Chatrie*, 146 S. Ct. at 2202 (government obtained Location History data through magistrate-issued geofence warrant directed to Google). As set forth above, information gathered from Flock AI surveillance can be just as, if not more, revealing as the CSLI at issue in *Carpenter*. (*See supra* at pp. 13-19.) Accordingly, the same warrant requirement applies.

Because the government will be unable to meet its burden to show that one of the narrow, carefully guarded exceptions to the warrant requirement applied here, *see Carpenter*, 585 U.S. at 319-20, all direct and derivative evidence police obtained as a result of that illegality must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Here, Loveland Police could not have located, identified, investigated, stopped, arrested, or searched Ms. Nelson, her car, her phone, or her house if not for their warrantless search through the Flock AI surveillance database. Accordingly, Ms. Nelson respectfully requests that this Court suppress all fruits of the unconstitutional, warrantless search.

**Conclusion**

For the reasons set forth above, Ms. Nelson respectfully requests that this Court set an evidentiary hearing and, ultimately, grant her suppression motion. Loveland Police's use of Flock AI surveillance technology invaded Ms. Nelson's reasonable expectation of privacy in her historical and real-time location and movements. Accordingly, the Court should suppress all direct and derivative evidence police obtained as a result of their unconstitutional, warrantless search.

Respectfully submitted,

MATTHEW K. BELCHER
Interim Federal Public Defender

*s/ Mary V. Butterton*
MARY V. BUTTERTON

*s/ Stephanie Snyder*
STEPHANIE SNYDER

Assistant Federal Public Defenders
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Mary_Butterton@fd.org
Stephanie_Snyder@fd.org
Attorneys for Lucy Grace Nelson

**CERTIFICATION RE: USE OF GENERATIVE ARTIFICIAL INTELLIGENCE ("AI')**

Per the Court's Standing Order regarding the use of Generative Artificial Intelligence ("AI") in court filings, all individuals who contributed to the drafting of this filing certify that generative artificial intelligence was not used to draft this document.

*s/ Mary V. Butterton*
MARY V. BUTTERTON

*s/ Stephanie Snyder*
STEPHANIE SNYDER

*s/ Amy Senia*
AMY SENIA

Assistant Federal Public Defenders

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2026, I filed the foregoing ***Motion to Suppress Evidence*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Cassandra J. Wiemken, Assistant United States Attorney
Email: cassandra.wiemken@usdoj.gov

Adam D. McConney, Assistant United States Attorney
Email: adam.mcconney@usdoj.gov

Bryan Fields, Assistant United States Attorney
Email: bryan.fields3@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Lucy Grace Nelson (via U.S. mail)

*s/ Mary V. Butterton*
MARY V. BUTTERTON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Mary_Butterton@fd.org
Attorney for Lucy Grace Nelson