# Exhibit A

**CASE NO:** 25-cr-0075-NYW

**AFFIDAVIT OF EXPERT WITNESS:** Steven Keener, Ph.D.

## I. QUALIFICATIONS AND EXPERTISE

1. I am an Assistant Professor of Criminology and Director of the Center for Crime, Equity, and Justice Research and Policy at Christopher Newport University (CNU), located in Newport News, Virginia.
2. I hold a Ph.D. in Public Policy & Administration, with a specialization in Criminal Justice Policy. I have specialized expertise in modern policing technologies and surveillance.
3. To date, I have authored or co-authored 17 peer-reviewed journal articles, two book chapters, 17 government and professional reports, and four encyclopedia articles.
4. A significant portion of my current academic research focuses on police technology and surveillance. I served as the lead author on the first geospatial analysis in the United States examining verified automated license plate reader (ALPR) camera deployment, served as the lead author of a statewide geospatial analysis of crowdsourced ALPR and gunshot detection system (GDS) deployment, and am a co-author on an analysis of the relationship between violent crime rates, overdose rates, and ALPR camera deployment.
5. I regularly present research on ALPR technology to academic peers, criminal justice system actors, public officials, and community organizations. I often meet with elected officials and justice system leaders to discuss ALPR issues and the findings of our research. I also teach university-level courses covering surveillance technology in modern policing.

## II. MATERIALS REVIEWED

In preparing this declaration, I reviewed case materials and evidence provided in discovery, including:

1. Case discovery pages: INV_28–29, INV_40–41, INV_90–98, INV_001–317, INV_327–460, INV_676–700, INV_2225–2537, and INV_2647–2552.
2. Flock camera usage reports, discovery spreadsheets (INV_00002540 through INV_00002546, INV_00001918, INV_00002306, INV_00002307, INV_00002320, INV_00002321, and INV_00002553), and image capture folders (INV_00001919 and INV_00001920).
3. The Contract between Flock Group, Inc. (Flock Safety) and the Loveland Police Department.

## III. OVERVIEW OF FLOCK TECHNOLOGY AND SYSTEMIC RISKS

1. ALPR cameras are fixed or mobile camera systems that capture images of every passing vehicle. Private vendors, primarily Flock Safety (henceforth referred to as Flock cameras), lease these cameras to law enforcement agencies, private companies, and homeowner associations across over 5,000 U.S. localities (Falayi, 2025; Flock Safety, 2026; Wardwell, 2025).
2. Flock cameras automatically take a picture when a license plate passes; however, the image captures more than just the license plate. It captures a "vehicle fingerprint," identifying a vehicle's make, model, color, license plate, and distinct features such as decals, bumper stickers, roof racks, and body damage (Romero & Gecan, 2026).
3. These vehicle fingerprints are instantly sent to a centralized, searchable database shared across law enforcement agencies nationwide, typically accessible without a judicial warrant or court order (Falayi, 2025).
4. In cities that have a real-time crime center, like Denver, the Flock camera images can be integrated with other surveillance technology around the city to build a comprehensive surveillance state. For example, Denver's real-time crime center can integrate high activity location (HALO) camera feeds, as well as camera feeds that belong to Denver Public Schools, the Regional Transportation District, and Coors Field, to give law enforcement an expansive real-time view of the city (Jojola, 2020).
5. The vast scale of this network creates severe risks regarding data security, systemic misuse, and technical malfunctions (ACLU, 2013; Derby, 2012; Doudna, 2025; Guariglia & Kelley, 2024; Lum et al., 2010; Merola & Lum, 2012; Rushin, 2011). These privacy and oversight concerns have prompted municipalities—such as Charlottesville and Harrisonburg, VA; Eugene, OR; Flagstaff, AZ; and Fort Collins, CO—to terminate or decline contracts with ALPR providers (Joffe-Block, 2026; Keller, 2026; Kutner, 2026; Powell, 2026).
6. Flock cameras collect data automatically and indiscriminately on every driver that drives past. This surveillance technology gives law enforcement unprecedented access to individuals' daily movements, patterns, and habits without a warrant. Before this technology existed, it would not have been possible for law enforcement to put together this detailed and expansive retrospective tracking of individuals' daily movements. In fact, when hackers easily penetrated a Flock camera, they described it as "Netflix for Stalkers" (Chidi, 2026).
7. Flock Safety also produces more surveillance technology than just ALPR cameras. For example, they now sell Condor cameras, which is a pan-tilt-zoom camera equipped with AI to follow humans and then stream that video directly to police. Flock Safety produces and sells these cameras despite stating that Flock does not track people (Barrientos, 2026). They also are selling first responder drones, which stream live video to police officers that can be stored, shared, and analyzed (Lipton, 2026). These drones can be used by law enforcement as aerial ALPR cameras, making it easier to track vehicles and providing even more real-time surveillance capabilities (Lipton, 2025). In fact, Loveland police have said they use their drone to track down suspects (McRae, 2025).

8. Flock cameras are marketed to assist law enforcement agencies with predictive policing efforts. Predictive policing refers to a data-driven approach wherein police departments attempt to forecast where crime may occur and deploy resources accordingly to prevent it (Lee, Bradford, & Posch, 2024). Predictive policing models have generated significant concern, largely because they rely on historical data that reflect institutional bias, thereby exacerbating the over-policing of marginalized communities. Furthermore, there is substantial variability in commercially produced predictive policing software, which lacks federal or state standardization and accountability. Currently, there is little empirical evidence demonstrating that predictive policing improves community safety (Cutler, 2024).
9. Law enforcement agencies can query the Flock database to cross-reference vehicles that passed a specific camera within a given timeframe. This capability allows agencies to search for patterns they deem suspicious, such as two vehicles frequently passing cameras in tandem. By reconstructing vehicle movements and cross-referencing timestamps, law enforcement can utilize this data to identify an individual's potential associates. This creates a clearly problematic precedent: officers may classify additional drivers as suspicious simply due to an association with a target subject, subsequently adding those individuals to a hotlist alongside the primary subject.
10. The AI capabilities of the Flock database enable invasive searching, cross-referencing, and automated assumptions regarding individuals and their associates. Without Flock cameras and the shared, AI-equipped database, officers would be incapable of mapping these connections manually—a task that would otherwise require physically standing on a street corner, recording every license plate number, and manually cross-referencing the data over extended periods.
11. The AI-equipped Flock database offers officers multiple search parameters to query this information. For example, users can search by a particular license plate or by specific vehicle descriptors, such as make, model, body type, or distinguishing features.

## IV. TECHNICAL CAPABILITIES, INTRUSIVENESS, AND RETENTION ISSUES

1. **Indiscriminate Data Capture:** According to Bureau of Transportation figures, personal motor vehicles account for roughly 87% of daily travel in the United States, with the average American driving 29 miles a day (Levenson, 2026). Flock's estimated 120,000 nationwide cameras capture approximately 20 billion vehicle fingerprints monthly (Felder, 2026; Landes, 2026), intensively surveilling law-abiding citizens who have no mechanism to opt out of this surveillance.
    a. Over three quarters of the departments that use Flock cameras opt into the live database option, allowing them to view the license plates, locations, and direction the car was driving at the time of passing the Flock camera (Collier, 2025).
    b. The empirical literature has largely been inconsistent in determining whether Flock cameras have the impact on crime rates and clearance rates claimed by the companies selling the technology. However, the research has clearly found that ALPR cameras scan plates far quicker than individual officers and allow for large scale surveillance of drivers that would not be possible if it were up to officers to do the scanning and tracking (Taylor, Koper, & Woods, 2012).

2. **Precision of Locations:** Flock cameras tell law enforcement the exact geographic coordinates a vehicle passed, along with the precise time and date. Given the high density of Flock cameras in cities, drivers commonly pass multiple cameras during a single trip. This allows law enforcement to trace with high certainty the pattern of a driver's movement through the city based on the alerts triggered at specific camera locations.
   a. Cell site location information (CSLI), on the other hand, shows only the cell towers a phone connected to—not the phone's exact coordinates. A number of factors shape the accuracy of CSLI. For example, there are often fewer cell towers in rural areas, providing less precise locations than in urban areas. Additionally, obstacles like buildings and trees can affect signal connection, forcing a phone to connect to a tower further away than the closest one. For these reasons, location data in the Flock database is more precise and consistent than CSLI.
3. **Invasion of First Amendment & Sensitive Activities:** High-resolution Flock cameras routinely capture bumper stickers revealing political beliefs or other personal information, alongside clear views into vehicle cabins revealing drivers and passengers. It is important to note that from the images observed in the evidence, pictures taken by Flock cameras during the day could reveal drivers and passengers in the vehicle. By capturing continuous location data near sensitive locations, the database tracks private activities:
   a. *Religious Observance:* Flock cameras near Loveland places of worship (e.g., River of Life Christian Fellowship, Foundations Church, St. John the Evangelist Catholic Parish) record when citizens attend services. This would not be the first time that worshippers were tracked, when considering in New York City license plate reader data was used to track individuals going to mosques (Goldman & Apuzzo, 2012).
   b. *Medical Care:* Flock cameras placed near healthcare facilities (e.g., UCHealth Family Medicine, Banner Health, South Loveland Community Health, Glenn Fertility & Family Wellness) compile detailed records of medical and reproductive healthcare visits.
   c. *Civic & Political Assembly:* Flock's network has been used to track civilians attending political rallies, such as "No Kings" demonstrations, enabling political profiling by government entities (Maass & Alajaji, 2025). This data could also be used to track when individuals attend political rallies or local advocacy meetings, including meetings advocating for the cancellation of Flock contracts. This is especially concerning considering the Flock Safety CEO described DeFlock, the crowdsourcing mapping of ALPR cameras (https://deflock.org/), as a terroristic organization (Brewster, 2026).
   d. Comprehensive Profile: Given the amount of information that is being collected, law enforcement can build a comprehensive profile of individuals. For example, it can reveal the political affiliation of the individual through bumper stickers, as well as meetings, protests, and rallies they drive to attend. They can determine an individual's faith based on when and how often they pass cameras that are near places of worship. They can determine an individual's socioeconomic status based

upon the places and neighborhoods they frequent and when. This dataset can also reveal when individuals are home and when they are away from home based upon both their daily movement patterns, as well as the real-time alerts when they are passing the Flock cameras.

4. **Predictive Analytics:** Because Flock systems log long-term movement patterns, algorithms can analyze historical datasets to project an individual's future movements, routine commutes, and schedules.
5. **Data Retention & Side-Door Access:** Although statutory frameworks in several states mandate deletion timelines (e.g., 21 days) (Doherty, 2026; Goldstein-Street, 2026; Powell, 2026; Smink, 2026), independent government audits reveal non-compliance by police agencies. For example, a Virginia Crime Commission (2026) report revealed that departments were violating House Bill 2724 by storing the data longer than 21 days, as well as sharing the data with agencies out-of-state and the federal government.
    a. Furthermore, because Loveland shares system access with over 700 outside law enforcement agencies (INV_00002553), the images captured by their Flock cameras are exposed to agencies across the country.
    b. The Flock database is ripe for abuse with "side-doors" in which a law enforcement agency that is friendly with the federal government or other entities, gives that other agency access to their own Flock data, as well as the Flock data of agencies that share with them. This allows outside entities to bypass local statutory safeguards and access their data even if the locality did not intend to share it with them (Center for Human Rights, 2025).
    c. In Loveland, a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agent was given access to the city's Flock database and listed "ICE" as the reason for accessing and searching it (Soicher, 2025). This is a clear example of federal agencies gaining access to the Flock database through a side-door access point.
6. **Other Weaknesses:** Beyond departments violating the guardrails, there are several other weaknesses. For example, the federal government is not constrained by state legislative restrictions. Also, there are typically broad legal criteria for using Flock photos in the investigations.
    a. Placing an individual on a hotlist also allows officers, both on and off-duty, to receive real-time notification when an individual on the hotlist passes a Flock camera.
    b. A hotlist, in relation to Flock cameras, is a database of license plates, as well as vehicle and driver information, that are of interest to law enforcement. Individuals and/or their vehicles can be added to a hotlist for a myriad of reasons, including, but not limited to: 1) suspicion of being a stolen vehicle; 2) suspicion of driving without a valid driver's license and/or vehicle registration; 3) being on a public safety or emergency alert list (e.g. Amber Alerts); 4) suspicions of being involved in a criminal activity; 5) being in a federal data or state database (e.g. NCIC).

c. Once individuals are placed on a hotlist, the data on these individuals can be stored beyond the data retention deadlines specified in the state legislation, as well as Flock's typical 30-day retention policy.
d. State legislation typically does not prevent AI from creating algorithms to surveil specific groups using the data collected by Flock cameras.
e. There is also an option to add vehicles to a "safe list" or "whitelist." This indicates that a vehicle is trusted by law enforcement and exempts it from triggering alerts when passing Flock cameras. This creates a two-tier surveillance apparatus, where law enforcement can exempt people close to them from being surveilled, while those who do not have law enforcement connections—or a way to earn this supposed "trust" from law enforcement—cannot opt out of this constant surveillance when they drive.

## V. ANALYSIS OF EVIDENCE SPECIFIC TO LOVELAND, COLORADO

1. **Camera Density and Local Coverage:** Loveland maintains 28 active Flock cameras (INV_00002307), representing a density of 3.67 cameras per 10,000 residents (or approximately one camera per 1.23 square miles). This density creates a pervasive grid where routine travel without capture is virtually impossible. For example, the following examples show the amount of Flock cameras someone passes in Loveland doing routine, but personal, daily or weekly tasks:
    a. Traveling from Grove Apartments to South Loveland Community Health Center triggers 4 camera passes (8 total captures round-trip).
    b. Traveling from Waterford Place Apartments to the Women's Clinic of Northern Colorado triggers 4 camera passes (8 captures round-trip).
    c. Traveling from PeakView Apartments to Citipointe Church triggers 5 camera passes (10 captures round-trip).
2. **Camera Density Extended:** The aforementioned 28 Flock cameras are those that are publicly funded. According to DeFlock's crowdsourced ALPR locations, there are an estimated 49 ALPR cameras in Loveland. These additional 21 cameras are funded by other sources, such as retail businesses; however, they can—and are encouraged to—share their data with the Flock database accessible to law enforcement. This means that even though these cameras are not funded by law enforcement, they feed data into the same system, extending the surveillance apparatus and further expanding the digital dragnet.
    a. Including all 49 ALPR cameras in Loveland yields a camera density of 6.02 cameras per 10,000 residents (or approximately 1.42 cameras per square mile). The total likely exceeds 49, as additional cameras may not yet be identified or uploaded to the DeFlock database due to its reliance on crowdsourced reporting.
    b. The defendant was also surveilled by Flock cameras while driving in Boulder and Lyons, Colorado. According to DeFlock, there are 47 ALPR cameras in Boulder and 4 in Lyons. When factoring in the cameras tracking the defendant in Loveland, Boulder, and Lyons—as well as cameras located between these jurisdictions—over 100 cameras were tracking the defendant's movements across parts of Colorado.

This expansive surveillance network means that the defendant was constantly being observed while going about their daily life, even beyond Loveland.

3. **Technical Misreads and Error Rates:** Discovery files confirm that Flock hardware repeatedly misread the target vehicle license plate (EGAZ66) as EGA266, requiring manual officer intervention. While Flock claims a 1% error rate, at national scale this generates roughly 200 million misreads per month (Felder, 2026). In low-visibility conditions—such as the nighttime snow captured in case image files—manual verification becomes nearly impossible, creating significant risks of misidentification and dangerous law enforcement stops.
    a. This is extremely concerning given examples in which technical misreads have led to issues such as in Aurora, Colorado, when a family with children was held at gunpoint by police officers after a license plate reader incorrectly identified their car as stolen (Prentzel, 2026). Also, there are examples of people being wrongly accused of a crime because of technical issues with Flock cameras (Morfitt, 2025).
4. **Overreach via Hotlists and Notifications:**
    a. The Master Services Agreement (INV_00002257) defined a hotlist as "a digital file containing alphanumeric license plate-related information pertaining to vehicles of interest, which may include stolen vehicles, stolen vehicle license plates, vehicles owned or associated with missing person(s), vehicles suspected of being involved with criminal or terrorist activities, and other legitimate law enforcement purposes. Hotlist also includes, but is not limited to, national data (i.e., NCIC) for similar categories, license plates associated with AMBER Alerts or Missing Persons/Vulnerable Adult Alerts, and includes manually entered license plate information associated with crimes that have occurred in any local jurisdiction."
        i. The Loveland ALPR Policy and Procedure (INV_00002287) defined a hotlist as "data that is downloaded daily to the ALPR system that contains information on stolen vehicles, stolen vehicle license plates, suspended or revoked driver licenses, invalid vehicle registrations, and other significant law enforcement interest such as AMBER alerts or missing persons alerts, terrorist watch lists, Be On the Look Out (BOLO) alerts, or other wanted individuals or vehicles. The information is provided and entered by the Colorado Bureau of Investigation (CBI), the National Crime Information Center (NCIC), the Colorado Crime Information Center (CCIC), Department of Motor Vehicles (DMV), and the Department of Revenue (DOR)."
        ii. Both of these definitions allow departments to manually enter license plates for vehicles of interest on the hotlist alongside individuals included in national and state datasets.
        iii. The fact that Loveland police can add any individual to the hotlist that are suspected of a crime or of significant interest to law enforcement, as well as stolen vehicles and invalid vehicle registrations, means their hotlist can be expansive. This results in a large number of individuals in Loveland potentially initiating real-time alerts to officers on and off-duty, as well as their Flock data being accessible beyond the typical 30-day retention period.

b. *Off-Duty Alerting:* Discovery reveals that Officer Zach Noble received real-time hotlist movement notifications on his personal mobile phone while off-duty, demonstrating that system access is far broader than commonly indicated by Flock Safety. The fact that EGA-Z66 license plate had been put on the hotlist meant that the defendant was being extensively surveilled, to the point that Loveland officers, both on and off duty, were receiving automatic alerts of their movements.

c. *Surveillance of Non-Suspect Family Members:* Loveland police added the defendant's mother, sister, brother-in-law, and niece to the Flock hotlist (INV_00002306). These uninvolved individuals were subjected to continuous, real-time tracking whenever their vehicles passed a Flock camera. This is a clear example of innocent individuals being unnecessarily and extensively surveilled, without their knowledge. It also indicates how broad the hotlist is, and how easy it is to be added to it, which then initiates these real-time movement alerts.

d. *Indefinite Retention:* Adding individuals to a hotlist removes their movement logs from standard deletion cycles (e.g., 30 days), retaining their location histories indefinitely. The duration of time in which these drivers' movements were being monitored and stored, made forward-looking predictions about where individuals will be driving and at what time more accurate. The longer the duration of the tracking, the more evident the individuals' patterns and habits become. For the defendant, and their family members that were added to the hotlist, there was no way to opt out of this constant surveillance.

e. *Broad Multi-Network Searches:* Eight distinct officers executed broad national queries for EGA266 across 6,268 connected network nodes, thus monitoring unrelated drivers nationwide.

## VI. CONTRACTUAL ANALYSIS: FLOCK SAFETY & LOVELAND POLICE DEPARTMENT

1. An examination of the Loveland Police Department contract with Flock Group, Inc. (INV_2537, 2647–2552) shows that the vendor retains expansive commercial and operational rights over the local surveillance data:

   a. **Sections 4.1 & 4.2:** Grants Flock an "irrevocable, worldwide, royalty-free license" to utilize captured customer data.

   b. **Section 4.3:** Authorizes Flock to anonymize, compile, and aggregate municipal data in perpetuity to train proprietary machine-learning and artificial intelligence algorithms.

   c. **Section 5.3:** Permits Flock to disclose footage to outside law enforcement, third parties, or federal authorities under broad, unilateral "emergency" or legal process exemptions.

      i. This is particularly concerning because: (1) Flock claims that localities own their data, but these contractual provisions undermine sole ownership; (2) Flock retains the right to use the collected data to train machine-learning and

artificial intelligence algorithms, meaning Loveland's data is embedded into algorithms that will continue to be used beyond 30 days and outside the scope of Loveland; (3) Flock claims that only law enforcement has access to the collected data, yet these terms allow them to share it outside of law enforcement; and (4) the location and movement pattern data collected and aggregated by Flock could be profitable if sold to third parties.

   d. **Section 10.2:** Establishes that Flock actively advises local departments on camera placement and strategic deployment mapping, allowing a private, out-of-state corporation to directly influence which local neighborhoods and sensitive locations are subjected to heavy surveillance.

2. Under Loveland Police Department Policy 11.45 (INV_2537, 2647–2552), a “hotlist" is specifically restricted to daily downloaded data regarding stolen vehicles, invalid/suspended credentials, or high-priority law enforcement alerts (e.g., AMBER alerts, BOLO alerts, terrorist watch lists, or wanted persons/vehicles). Adding the defendant’s family members to this hotlist deviates significantly from standard protocol because:
   a. The family members of the defendant were not accused of or charged with a crime.
   b. The underlying arson investigation does not justify expanding automated hotlist surveillance beyond the primary suspect to include uncharged family members.
3. **Indefinite Data Retention and Pattern Profiling:** Policy 11.45 establishes a mandatory default deletion window of 30 days for all ALPR data and images.
   a. However, the policy allows retention beyond 30 days if deemed necessary for an ongoing criminal investigation with supervisory approval.
   b. In this case, invoking this exception to retain Flock data on both the defendant and their family members improperly expanded the scope of state surveillance, enabling law enforcement to reconstruct and analyze the private daily habits and travel patterns of uncharged individuals over an extended duration.

## VII. CONCLUSION

Based on my academic expertise and review of the case evidence, the deployment of Flock ALPR cameras nationwide and in and around Loveland specifically constitutes an unprecedented and highly invasive surveillance infrastructure. The system executes continuous, retrospective, and predictive tracking of citizens without warrants; presents severe technical error rates; and grants broad and under-regulated access to private movement data.

Steven Keener — August 7, 2026

Dr. Steven Keener, Ph.D. — Date

## References

ACLU. (2013). In VT, ALPRs Are Regulated. American Civil Liberties Union. Available online: https://www.acluvt.org/news/vt-alprs-are-regulated/. (accessed on 27 July 2026).

Brewster, T. (2026). Flock CEO apologizes for calling activists 'terrorists'. Forbes. Available online: https://www.forbes.com/sites/thomasbrewster/2026/07/17/flock-ceo-sorry-for-labelling-activists-terrorists/. (accessed on 29 July 2026).

Center for Human Rights University of Washington. (2025). Leaving the door wide open: Flock surveillance systems expose Washington data to immigration enforcement. Center for Human Rights University of Washington: The Henry M. Jackson School of International Studies. Available online: https://jsis.washington.edu/humanrights/2025/10/21/leaving-the-door-wide-open/. (accessed on 29 July 2026).

Chidi, G. (2026). 'Creepy surveillance': Why some cities are shutting down Flock cameras amid privacy concerns. The Guardian. Available online: https://www.theguardian.com/us-news/ng-interactive/2026/apr/06/flock-cameras-privacy-concerns. (accessed on 29 July 2026).

Collier, K. (2025). Police cameras track billions of license plates per month. Communities are pushing back. NBC News. Available online: https://www.nbcnews.com/tech/tech-news/flock-police-cameras-scan-billions-month-sparking-protests-rcna230037. (accessed on 29 July 2026).

Cutler, M. (2024). Development of and concerns regarding policing practices. Michigan Science, Technology, and Public Policy. Available online: https://stpp.fordschool.umich.edu/research/policy-brief/development-and-concerns-regarding-predictive-policing-practices.

Derby, P. (2012). Policing in the age of information: Automatic number plate recognition. In Eyes Everywhere: The Global Growth of Camera Surveillance; Doyle, A., Lippert, R., Lyon, D., Eds.; Routledge: London, UK.

Doherty, J. (2026). Christiansburg police chief addresses ALPR misconceptions, explains data rules. NBC 10 News. Available online: https://www.wsls.com/news/local/2026/06/24/christiansburg-flock-cam-day-2/. (accessed on 29 July 2026).

Doudna, M. (2025). Braselton Police Chief Accused of Misusing Police Cameras to Stalk People. WSB-TV2 Atlanta. Available online: https://www.yahoo.com/news/articles/braselton-police-chief-resigns-announces-083652183.html. (accessed on v 2026).

Falayi, K. (2025). Who Combed Virginia's Flock Surveillance Data for Immigration Enforcement? Search Here. Virginia Center for Investigative Journalism at WHRO. Available online: https://www.whro.org/virginia-center-for-investigative-journalism/2025-09-24/flock-surveillance-camera-search-database. (accessed on 27 July 2026).

Felder, J. (2026). Flock says its cameras worked 'correctly' when police tracked and ambushed me for no reason. The Drive. Available online: https://www.thedrive.com/news/inside-the-flock-dragnet-how-systemic-errors-led-to-police-ambushing-me-for-no-reason. (accessed 30 July 2026).

Flock Safety. (2026). How Many Crimes Do Automated License Plate Readers (ALPRs) Solve, Anyway? Available online: https://www.flocksafety.com/customers/how-many-crimes-do-automated-license-plate-readers-alprs-solve-anyway. (accessed on 27 July 2026).

Goldman, A. & Apuzzo, M. (2012). With cameras, informants, NYPD eyes mosques. The Associated Press. Available online: https://www.ap.org/media-center/ap-in-the-news/2012/with-cameras-informants-nypd-eyed-mosques/. (accessed on 29 July 2026).

Goldstein-Street, J. (2026). Washington adds safeguards for Flock cameras. Washington State Standard. Available online: https://washingtonstatestandard.com/2026/03/30/washington-adds-safeguards-for-flock-cameras/. (accessed on 29 July 2026).

Guariglia, M. & Kelley, J. (2024). New ALPR Vulnerabilities Prove Mass Surveillance Is a Public Safety Threat; Electronic Frontier Foundation: San Francisco, CA, USA. Available online: https://www.eff.org/deeplinks/2024/06/new-alpr-vulnerabilities-prove-mass-surveillance-public-safety-threat. (accessed on 27 July 2026).

Joffe-Block J. (2026). Why some cities are ditching their Flock license plate readers. NPR Radio. Available from: https://www.npr.org/2026/02/17/nx-s1-5612825/flock-contracts-canceled-immigration-survillance-concerns. (accessed 29 July 2026).

Jojola, J. (2020). Denver police quietly expands surveillance camera network. 9 NBC News. Available online: https://www.9news.com/article/news/local/denver-police-quietly-expand-surveillance-camera-network/73-80b180c4-2456-4a28-b106-feb1831ea61f. (accessed 29 July 2026).

Keener, S., Finn, J., & Baird, A. (2026). Surveillance inequality: Race, poverty, and the geography of automated license plate reader deployment. SocArXiv.

Keller, L. (2026). Harrisonburg city council votes to end contract with Flock Safety. WHSV3. Available online: https://www.whsv.com/2026/07/29/harrisonburg-city-council-votes-end-contract-with-flock-safety/. (accessed 29 July 2026).

Kutner, B. (2026). Virginia Legislators Ding Local Law Enforcement over Surveillance Abuses. Radio IQ/WVTF. 12 March 2026. Available online: https://www.wvtf.org/news/2026-03-12/virginia-legislators-ding-local-law-enforcement-over-surveillance-abuses (accessed on 28 July 2026).

Landes, A. (2026). License plate cameras scan 20 billion vehicles monthly-cities are canceling contracts. Gadget Review. Available online: https://www.gadgetreview.com/license-plate-cameras-scan-20-billion-vehicles-monthly-cities-are-canceling-contracts. (accessed on 30 July 2026).

Lee, Y., Bradford, B., & Posch, K. (2024). The effectiveness of big data-driven predictive policing: Systematic Review. Justice Evaluation Journal, 7(2), 127-160. Doi: https://doi.org/10.1080/24751970.2024.2371781.

Levenson, E. (2026). Inside the growing police use and misuse of Flock's license-plate reader cameras. CNN. Available online: https://www.cnn.com/2026/07/26/us/flock-cameras-surveillance-abuse. (accessed on 29 July 2026).

Lipton, B. (2025). That drone in the sky could be tracking your car. Electronic Frontier Foundation. Available online: https://www.eff.org/deeplinks/2025/09/drone-sky-could-be-tracking-your-car. (accessed on 29 July 2026).

Lipton, B. (2026). Hundreds of drone-as-first responder programs could soon be launched across the country. Electronic Frontier Foundation. Available online: https://www.eff.org/deeplinks/2026/07/hundreds-drone-first-responder-programs-could-soon-be-launched-across-country. (accessed on 29 July 2026).

Lum, C., Merola, L., Willis, J., & Cave, B. (2010). License Plate Recognition Technology (LPR): Impact Evaluation and Community Assessment. George Mason University Center for Evidence-Based Crime Policy. Available online: https://cebcp.org/wp-content/evidence-based-policing/LPR_FINAL.pdf. (accessed on 28 July 2026).

Maass, D. & Alajaji, R. (2025). How cops are using Flock Safety's ALPR network to surveil protesters and activists. Electronic Frontier Foundation. Available online: https://www.eff.org/deeplinks/2025/11/how-cops-are-using-flock-safetys-alpr-network-surveil-protesters-and-activists. (accessed on 29 July 2026).

Marlow, C. (2026). How to fight deployment of Flock and other mass surveillance license plate readers in your community. ACLU. Available online: https://www.aclu.org/news/privacy-technology/tracking-alpr-cameras/how-to-fight-deployment-of-flock-and-other-mass-surveillance-license-plate-readers-in-your-community. (accessed 29 July 2026).

McRae, J. (2025). Officers in Colorado use drone to catch hiding motorcyclist who sped away from traffic stop at 100 mph, police say. CBS News. Available online:

https://www.cbsnews.com/colorado/news/loveland-colorado-drone-motorcyclist-traffic-stop-100-mph/?utm_campaign=snd-autopilot. (accessed 29 July 2026).

Merola, L. & Lum, C. (2012). Privacy and the impact of emerging surveillance technologies: The case of license plate recognition technology. Judicature, 96, 119–126.

Morfitt, K. (2025). Flock cameras lead Colorado police to wrong suspect: "It became my job to prove my innocence." CBS News. Available online: https://www.cbsnews.com/colorado/news/flock-cameras-lead-colorado-police-wrong-suspect/. (accessed 30 July 2026).

Powell, R. (2026). Flock cameras are out in Fort Collins, as council votes to end contract. Coloradoan. Available online: https://www.coloradoan.com/story/news/local/2026/06/16/fort-collins-to-immediately-end-contract-with-flock-safety/90584281007/. (accessed on 29 July 2026).

Prentzel, O. (2025). Privacy advocates clash with local police over license plate reader restriction bill. Sentinel. Available online: https://sentinelcolorado.com/metro/privacy-advocates-clash-with-local-police-over-license-plate-reader-restriction-bill/. (accessed on 30 July 2026).

Romero, R. & Gecan, A.N. (2026). What are Flock cameras, and why are they controversial in Berkley? Berkleyside. Available online: https://www.berkeleyside.org/2026/07/13/flock-safety-cameras-berkeley-license-plate-readers. (accessed on 29 July 2026).

Rushin, S. (2011). The judicial response to mass police surveillance. Journal of Law and Technology Policy, 281–329.

Smink, S. (2026). CT's new rules and limits for license plate cameras. Eyewitness News 3. Available online: https://www.wfsb.com/2026/05/28/cts-new-rules-limits-license-plate-cameras/. (accessed on 29 July 2026).

Soicher, S. (2025). ATF license plate data search raises questions on Colorado law compliance. 9News NBC. Available online: https://www.9news.com/article/news/politics/atf-searches-ice-access-loveland-license-plate-tracking-cameras/73-f319ab3b-201d-42af-8dae-35870a63b94a.

Taylor B., Koper C., & Woods, D. (2012). Combating vehicle theft in Arizona: A randomized experiment with license plate recognition technology. Criminal Justice Review, 37(1): 24-50. doi: https://doi.org/10.1177/0734016811425858.

Virginia State Crime Commission. (2026). Law Enforcement Use of Automatic License Plate Recognition (ALPR) Update. 2026. Available online: https://vscc.virginia.gov/2026/VSCC%20ALPR%20Report%20January%202026%20FINAL%20REVISED%20Jan%2021%202026.pdf. (accessed on 28 July 2026).

Wardwell, F. (2025). Liberal Towns Backtrack on License Plate Trackers Amid Concerns About Privacy—And Trump. Politico. Available online: https://www.politico.com/news/2025/11/30/license-plate-trackers-pushback-00670550. (accessed on 30 July 2026).