# Exhibit B

*Democracy Dies in Darkness*

EXCLUSIVE

# How rogue officers turned a nationwide camera network into a tool for stalking

Flock's array of license-plate cameras was built to fight crime. But at least 50 law enforcement officers were charged with or accused of misusing it and other systems.

August 2, 2026

By Drew Harwell, Douglas MacMillan and Aaron Schaffer

JEFFERSON, Ga. — Marci Bakely couldn't understand how her ex-boyfriend always seemed to know where she was.

When she went to buy groceries or on a date or to the doctor, he'd text her about it, sometimes within minutes, despite working 15 miles from her home as a police chief in a small town in the Atlanta suburbs. One day in 2024, when he incorrectly suspected that she'd gone to see a man against his wishes, he messaged her, "I didn't think you would slip up," according to texts she shared with The Washington Post.

Bakely, 50, began to feel like she was constantly being watched. She says she installed three cameras around her home and on her patio, to see if he was staking out her cul-de-sac. She bought a hidden-camera detector and nervously waved it down every wall. Three times, in desperation, she says she drove her Kia to a mechanic's shop, asking them to scan for trackers on her car.

Then one day, when she pressed him for answers, her ex told her in a text: He was using Flock.

Like thousands of other law-enforcement agencies across the United States, his police force could follow cars spotted by Flock's sprawling network of artificial-intelligence roadside cameras, which record passing license plates into a mappable database that officers can search while investigating crime.

Flock had sold its system as a police officer's dream crime-fighting tool. But the tool had also given the chief, Michael Steffman, the power to silently monitor Bakely's life. By the time she understood what was happening, Steffman had looked up the tags for her and her teenage daughter roughly 600 times, according to Have I Been Flocked, a website that aggregates police search logs made available through public records.

## Steffman searched Flock data for Bakely's license plate hundreds of times



On July 31, Steffman and Bakely exchanged text messages about his Flock camera searches:




Over the next seven months, Steffman continued to search for Bakely's plate over 500 more times:




Note: All times are Eastern.

LESLIE SHAPIRO/THE WASHINGTON POST

Source: Law-enforcement audit logs obtained by Have I Been Flocked

Steffman was arrested in November on charges of stalking, harassment and license-plate-reader misuse. In April, before a trial could take place, he was found dead in his home from what officials said was a suicide. The town manager of Braselton, where Steffman worked, declined to comment. The town's new police chief and four members of Steffman's family did not respond to requests for comment.

Backed by some of Silicon Valley's top investors, Flock has rapidly grown into a colossus of American technological surveillance. A leader of the surging industry for license-plate readers, the company told The Post that its more than 120,000 shoebox-size cameras now scan the roads of more than 6,000 communities and record 20 billion plate scans a month.

But bad actors have used this massive camera network as a powerful weapon for intimate surveillance. Authorities have charged or accused at least 50 law-enforcement officers of using license-plate readers for unauthorized purposes, including to stalk women without their knowledge or consent, a Post analysis of police and court records found.

In 26 of these cases, police investigators and prosecutors said the officers used the technology to spy on their wives, their girlfriends, their exes, their exes' new partners or women they wanted to meet. In other cases, police or prosecutors have not specified the alleged surveillance targets. Flock's system was used in 46 of the cases analyzed by The Post, while the other cases involved competing products.

Many of the plate-reader misuse cases were previously covered by local media outlets, and some were first compiled by the Institute for Justice, a civil liberties law firm in Arlington, Virginia.

The Post reviewed thousands of pages of court documents and internal police reports and conducted interviews with seven alleged victims, some of whom spoke publicly for the first time, to paint a comprehensive picture of the misuse of Flock and other license-plate readers by police officers around the country.

The review found that Flock gave police departments wide latitude about whether to activate settings that some police and privacy advocates argue could deter misconduct, and that many departments conducted limited oversight of their officers' searches. As a result, rogue police were able to monitor their subjects' movements with precision and secrecy.

After The Post relayed its findings to Flock, the company said in a statement it "will soon be announcing better filters and tools to stop abuse before it happens."

Flock officials said in interviews that officers who misuse its technology represent a small share of its 140,000 active users, and that the company offers training guides and search logs to help police departments run internal audits. In April, the company rolled out a new voluntary "audit assistance" feature, which agencies can choose to enable, that automatically scans officers' searches for suspicious activity, such as queries repeatedly targeting the same vehicle or run by officers off the clock.

In an interview with The Post, Flock chief executive Garrett Langley said misuse of its systems is inevitable and that the company is focused on providing tools to catch perpetrators after the fact. In their contracts with Flock, police departments agree to use the tool solely for "bona fide investigations" of crime.

"We're not going to change humans, and humans make bad decisions," Langley said. "What we can do is make sure that they know if you use this tool, you will be held accountable."

The Post's investigation sheds light on the scope of the technology's misuse across the country, as well as the toll on victims and families who felt they were constantly being watched.

Through automated license-plate reader systems, or ALPRs, officers could trace the rhythms and travels of their subjects' daily lives, leading in some instances to violent confrontations, moments of psychological manipulation, and threats of coercion and control, the analysis found.

In Wisconsin, a police officer allegedly used Flock to check whether his ex-girlfriend had gone to an abortion clinic, according to a police affidavit for a case set for trial this month.

In Kansas, a police chief who tracked his ex through Flock sneaked up on her while she was intimate with another man, a state police certification body alleged, leading to his firing.

In Florida, a deputy speeding to stop a young actress he'd added to a watch list for a license-plate tool called Guardian nearly caused a head-on crash, according to a police report and video from his dashboard camera. The deputy was arrested in March, and his attorney declined to comment.

And in California, prosecutors said a former deputy, Alexander Vanny, used Flock as part of a months-long campaign of "stalking" and "humiliating" his former fiancée that also involved following her around town and installing a hidden camera in her roommate's bathroom, according to a sentencing brief.

Vanny was convicted by a jury on 10 charges, including stalking and unauthorized access of electronic data, and sentenced in February to six years in prison. His attorney told The Post that case focused on Vanny photographing the license plate of a man who'd driven away with his former fiancée after she'd gone to a bar, and that he'd done so out of concern for her.

While some of the searches resulted in officers' firings, prosecutions and prison sentences, police departments in other cases allowed officers to continue using the systems even after receiving warnings that they were being misused.

"This was not a lapse in judgment; it was a continual, repetitive, obsessive behavior," a Wisconsin woman wrote in a domestic-abuse restraining order petition, saying that Flock data showed that her officer ex-boyfriend had searched the plates for her and her partner 179 times. She said she lived in a "constant state of fear and unease."

An array of privacy advocates has argued that Flock could deter bad actors by making simple changes to its product, such as requiring officers to label every search with a criminal case number. Some policing experts also warned that agencies' inconsistencies in developing and enforcing standard procedures for license-plate readers could lead to further misconduct. With no federal laws governing use and only a patchwork of state laws, many of the country's roughly 18,000 police agencies are left to decide their rules on their own.

Christian Quinn, a former commander with the Fairfax County police in Virginia who now consults with agencies and technology vendors, said privacy features and oversight by local governments shouldn't undermine the ability of police to do their jobs. Rules that significantly limit license-plate technologies, he said, could "chill the use of them altogether."

But Eva Galperin, the director of cybersecurity at the advocacy group Electronic Frontier Foundation, said that abuse of the tool is "inevitable" and that the company's approach to date, coupled with poor supervision by police leadership, has done little to protect women from abusive police officers.

"Flock has already claimed that they have oversight, that they have guardrails, and we still see these kinds of abuses," she said.

Officers' searches are logged by police agencies, but only some of them have been made available through public-records requests, making it tough for people to find out whether their cars are being tracked. Some of the women said they learned of the surveillance only after they received calls from internal-affairs investigators or ran their plate numbers through third-party tools such as Have I Been Flocked.

Some victims, such as Bakely, also say they've struggled to get their experiences taken seriously because the perpetrators are police, entrusted with broad authority to pursue investigations with operational secrecy and employed by the same agencies they were told to call for help.

Bakely said the cameras had left her feeling powerless to stop her ex-boyfriend from tracking her life. She didn't feel safe asking the police agency he led, she said, and she couldn't get access to records that would have shown the surveillance was happening in real time. After Steffman told her about his Flock searches, she filed for a restraining order, but a judge denied it on the basis that she couldn't prove ongoing abuse, court records show.

He "watched every single move I made," she said. But "who do you turn the chief of police in to?"

## 'As transformational as DNA'

When Bakely met Steffman on the dating app Tinder in 2022, he seemed like a perfect catch.

He had kids and coached Little League baseball. He loved crude jokes and was quick with a compliment. And he had a stable career, with 20 years in law enforcement. After several tough months during which Bakely, an Air Force veteran, uprooted her life to move closer to her parents, he helped her feel safe, like she wasn't alone.

"He literally was my only friend," she said in an interview.

After a few months, she said, he began to act differently — more controlling and paranoid. He looked through 13 years of her Facebook history, forcing her to block men who'd left her comments, she told The Post. He also demanded access to her Ring doorbell camera and looked up all the names in her phone's contact book.

The couple broke up in late 2023, she said, but Steffman's texts didn't stop. Randomly, sometimes in the middle of the night, he'd ask cryptic questions about where she'd gone then say he'd already "looked it up," according to a text exchange reviewed by The Post. She said he seemed to relish the idea of knowing things about her she had not wanted to share.

One day in July 2024, after she had pushed him to explain himself, he told her he had used a "Flock camera." She had no idea what that meant.

“It’s a camera system that reads tags,” he wrote in messages she shared with The Post. He insisted that it was a lapse in judgment and that he wouldn’t “ever look again.”

“Don’t worry I’m not tracking you or some weird stalker s--t,” he wrote, with a cry-laughing emoji.

It had been seven years since Flock had installed its first camera not far from here, in Atlanta, as part of an idea by Langley — then a recent engineering graduate from Georgia Tech — to protect his neighborhood from a string of smash-and-grabs.

Langley’s first camera was an Android phone, hung outside in a rainproof box. But soon his start-up began promoting itself as something far bigger, saying it was building “the first public safety operating system that eliminates crime.”

The company dispatched installers to hang the cameras along public roadways and sent sales teams to city halls and police expos with offers of quick-start leasing deals costing around $3,000 per camera per year, public contracting documents show.

Thousands of cities and police departments bought into the idea, and Flock gave them the choice to share their Flock data with other agencies or to view others' data from across city or state lines. Many homeowners associations, apartment complexes and strip malls began signing up, too, giving them a way to search through their own local camera feeds.

Flock quickly became the most prominent player in the burgeoning license-plate-reader business, rivaling systems from competitors such as Axon's Fleet 3 and Motorola's VehicleManager. Despite lacking the established law-enforcement relationships of its peers, Flock's surveillance-subscription packages made its cameras accessible for small-town police departments and neighborhood-watch groups. Flock said last year it had surpassed $300 million in annual revenue.

Flock told agencies that they could set their "own written rules for who can access the system and how it can be used," company documents show. Agency leaders decide which officers receive log-in credentials, according to Flock's rules, and the officers don't need a warrant to run a search; they just type a plate number and go.

Over time, Flock upgraded its tool's surveillance power, creating "hot lists" that notify officers whenever a target car is captured on camera and a "vehicle fingerprint" feature that lets them search for a vehicle by its look or characteristics — say, any white minivan with bumper stickers — without knowing its plate number, company documents show.

Flock engineers improved the cameras, too, wiring them to use solar panels and cellular networks so that they could be installed anywhere and record at all hours. Flock's flagship camera, the Falcon, uses a style of AI image recognition, known as computer vision, that can read the plate on a speeding car at night or in heavy rain.

Big venture capital firms including Andreessen Horowitz, an early Facebook investor, have poured money into Flock, betting on the company as a way to revolutionize policing. Flock, a private company, said last year its business was worth $7.5 billion.

In a TED Talk in April, Langley said the company had expanded into making camera drones, police software and audio-detection devices after seeing its success in license-plate readers, which he said a police chief had told him were, for crime fighting, "as transformational as DNA." He shared the story of how police used Flock to stop the abductor of a girl in Tennessee and said, "I don't know how many more 11-year-old girls need to be kidnapped … before we say enough is enough."

Asked onstage whether his system's use ever made him uncomfortable, Langley cited three recent instances of officer misuse, including a case that resembled Steffman's: "a police chief in northern Georgia that used Flock to track an ex-partner." Langley noted, however, that Flock's audit logs had been used to investigate the abuse — evidence, he said, that the company's safeguards were working.

"He was probably a bad person. He was going to do this, one way or another," Langley said. "And so I look at the 1 million-plus" criminal investigations Flock says it helped support last year "and go, okay, this is a trade-off that I can make."

## 'The police are already here'

For months, Bakely hadn't realized how often she had been driving by Flock cameras, which looked like automatic air fresheners and had been mounted high atop black utility poles. One recorded the road she drove to the Kroger supermarket; another faced a gas station. In the small downtown of Jefferson, where she lived, there were two recording in opposite directions, one on each side of the town's central creek.

She had believed Steffman when he said he had looked up her plates just once. Months later, when Bakely heard about the Have I Been Flocked website on the local news and looked up her plate's search history, she learned the truth. He had searched her car hundreds of times over a span of about 13 months, sometimes dozens of times a week, the audit records showed. Many of his searches were made between midnight and 4 a.m.

As Flock's popularity had ballooned with police, more officers had begun treating the tool like a personal spy device. In Kansas, a woman who drove her children to her father's house for breakfast one morning began receiving text messages from her ex-husband, Kechi police lieutenant Victor Heiar, demanding to know where she had taken their kids, according to an interview she gave police and text messages she shared with investigators that were reviewed by The Post.

Heiar later described the restaurant where she had just celebrated her birthday and the center where she took their kids to day care — a location she had hidden from him out of fear and distrust, she told police. Heiar was fired, his state police certification was revoked and he pleaded guilty to computer crime and stalking, for which he was sentenced to 18 months of probation. The Kechi police chief declined to comment. Heiar and his attorney did not respond to requests for comment.

And the monitoring sometimes preceded threats of violence or control. In Florida, Orange City officer Jarmarus Brown called his girlfriend on FaceTime to show her videos of her driving, according to a sheriff's office report. Once, he went to her apartment, grabbed her and reminded her that he carried a gun, leading her to threaten to call the police, an investigator's incident report alleged. He responded, the report said, by referring to himself: "The police are already here."

Brown was arrested last year and pleaded no contest to a charge of unauthorized use of computers. He was sentenced this month to five years of probation and a $618 fine. Brown's attorney and the Orange City police did not respond to requests for comment.

In some of the cases, officers used the searches to uncover deeply personal information about their subjects' lives. In Wisconsin, Menasha officer Cristian Morales used Flock to check whether his then-girlfriend had gone to a clinic to "seek a potential termination of said pregnancy," according to an affidavit from an investigating officer with another police department seeking to subpoena Flock for search records.

He texted the woman to say he had verified she didn't go to the clinic and told her, "You continue to lie," the affidavit alleged. He later contacted the clinic in an attempt to obtain her medical records, confronted her at her home and began calling her as many as 19 times a day, according to the affidavit.

The woman and Morales' attorney declined to comment. The Menasha police did not respond to requests for comment. Morales was charged in January with misconduct in public office and has pleaded not guilty. A criminal complaint said Morales admitted to searching for the woman's vehicle, labeling them in the Flock system as "welfare" checks, and blamed his decision on bad judgment, desperation and a lack of sleep.

Some officers, however, have defended their personal searches as normal behavior for police. Coty Wayne Hall, an officer in Niceville, Florida, ran 192 inappropriate Flock searches, including to track a former romantic partner, according to an internal-affairs investigation. The woman, a fellow officer, told investigators he once texted her details about what she was wearing one day when she took her kids to the park.

Hall was fired, pleaded no contest to charges of computer-system misuse, stalking and battery, and was sentenced to probation. In an interview, he said it was unfair that he was being made “out to be some sort of monster.”

“Pretty much everybody uses that computer system” improperly in the department, he said, and “they don’t audit it [nearly] as much as they should.” Niceville Police Chief Mark Hayse said in a statement that the department’s Flock use was audited “and only one individual was found to be out of compliance.”

## ‘No consequences’

Flock’s defenders have argued that the prosecutions of rogue officers prove that its guardrails work. But in some cases, officers were allowed to keep searching Flock’s data after being accused of misuse.

In Jerome County, Idaho, Sheriff Gary Taylor told The Post that a previous sheriff, George Oppedyk, had searched for his wife's car several times a day in the weeks after a prosecutor filed a complaint about him to the Idaho attorney general's office.

Oppedyk resigned months afterward, more than two years before his term was slated to end, and faced no charges with the attorney general, Raúl R. Labrador, who said in a February letter that his office couldn't prove a crime "beyond a reasonable doubt." Oppedyk, the letter said, had argued he'd run the searches "to check the system's reliability."

Labrador said in a statement that his office did not have the authority to prosecute Oppedyk because license-plate-reader misuse in Idaho is not regarded as a "standalone crime." He said he is working with state legislators to address this "gap in the law" so that they can prosecute future misuse.

Taylor said in an interview that Flock is a powerful law-enforcement tool but that he worries "a few bad apples [could] ruin it for everybody."

"If there are no consequences because the sheriff who abused it didn't get in trouble, what's to deter other people from doing the same thing?" Taylor said. Oppdeyk did not respond to requests for comment.

The vast majority of the surveillance targets identified by The Post are women, and several of them said the experience — menacing messages and confrontations that led to the revelation they'd been watched — left them feeling violated and paralyzed. Galperin, of EFF, said that asymmetry of power is a large part of what makes the tool so dangerous in the hands of bad officers.

"The goal of the abuser is to make themselves seem omniscient and omnipotent," she said. "You don't have to be watching your victim all the time. They just have to believe that at any moment you could be."

In some cases, license-plate data was just one component of a broader stalking campaign. In April, Kyle Rector, a former officer in Bonner Springs, Kansas, was charged with using law-enforcement equipment to stalk his estranged wife and two men he thought she was seeing, including by using data from a license-plate-reader system called ELSAG. Investigators also alleged they found monitoring software installed on her computer and a video camera hidden in her bedroom light switch.

Rector has not offered a plea yet in the case, and his attorney declined to comment. A preliminary hearing is scheduled for September. Bonner Springs police said the agency is cooperating with investigators. ELSAG's developer, the security contractor Leonardo, said it offers training and auditing tools to encourage responsible use.

Being subjected to extensive tracking left some women deeply unnerved, pushing some to change their lives or start driving their relatives' cars in hopes of not being tracked. One woman, a sheriff's deputy in Wisconsin who spoke on the condition of anonymity because she was fearful of further harassment, said she had her plate searched 16 times in a single day by a fellow deputy with whom she had been romantically involved.

The deputy lost his job after an internal investigation but has faced no criminal charges, and the lack of punishment has made the situation harder for her to move on, she said in an interview.

“I didn't leave my house for a week,” she said. “I was scared to see him.”

Adam Dodge, a former family-law attorney and founder of the cyber safety training group EndTAB, said the tool is too easily misused by officers to engage in acts of domestic violence. The fact that the offenders have guns, badges and access to surveillance technology makes it even harder for victims to report their suspicions, he said, for fear that they won't be believed and could face retribution if they speak out.

“Any time you give an abusive individual access to one of those systems, they are likely going to misuse it,” he said. And “where do you go as a victim if you’re being abused — you go to law enforcement, right?”

Some of the women who ultimately reported the misuse said they were dismissed or ignored. Alexandria Griffith, a mother in Leechburg, Pennsylvania, said in an interview that she repeatedly warned the police department and district attorney’s office that her officer husband had stalked and threatened her. During one text exchange she shared with The Post, the officer, Michael McSherry, shared a screenshot of her license plate in the search results of a Flock competitor to claim she had lied to him. “Plate readers dont lie,” he wrote.

Griffith said officials at both agencies dismissed her pleas. Within days, she said, McSherry confronted her in her parents’ home armed with a gun, shoving her and her 4-year-old son and threatening to kill himself, according to a police report.

In an interview with The Post, McSherry expressed regret for misusing the license-plate reader to track Griffith and disputed the police report's characterization of the altercation. He was arrested and pleaded guilty to stalking and official oppression, for which he served roughly 11 months in jail.

"A lot of people … knew that all of this was happening," Griffith said. "And they kind of just brushed me off."

## 'Police the police'

Flock has said incidents of abuse are unfortunate but tough to fully prevent, given the vast network of nationwide users and the reality that any tool can be abused. The company said that its audit logs have proved valuable for internal investigations, and that the "audit assistance" feature has already helped address some instances of misuse. Flock last month said a department in Albany, Georgia, fired five officers after the feature flagged signs of misconduct.

Langley, Flock's chief, has dismissed pushes by activists for the company to further limit how officers use its product.

"No one elected me the police chief of America," he told Forbes last year, adding, "I don't think it's our job to police the police."

Most law-enforcement agencies prohibit officers from accessing any police database for personal purposes, and in many departments such misuse is regarded as a fireable offense, according to Max Isaacs, director of law and policy at the New York University Law School's Policing Project.

But due to a patchwork of rules and regulations, the extent to which such officers are punished varies widely based on their agency and state. Thirteen states have adopted laws requiring police departments to audit officers' license-plate reader usage, the NYU group found. At least eight states have criminalized the misuse of license-plate readers, including Georgia, which classified this crime as misdemeanor "of a high and aggravated nature," the statute says.

## State license plate reader laws

| STATE | MANDATORY AUDITS | CRIMINALIZED MISUSE |
|---|---|---|
| California | ✓ | |
| Connecticut | ✓ | |
| Georgia | | ✓ |
| Idaho | ✓ | |
| Kentucky | ✓ | ✓ |
| Maine | | ✓ |
| Maryland | ✓ | ✓ |
| Minnesota | ✓ | |
| Montana | ✓ | |
| North Carolina | ✓ | ✓ |
| Oregon | ✓ | |
| Utah | ✓ | ✓ |
| Vermont | ✓ | |
| Virginia | ✓ | ✓ |
| Washington | ✓ | ✓ |

Some privacy advocates argue there are very basic changes Flock and police departments could make to prevent abuse. Jay Stanley, a policy analyst at the American Civil Liberties Union, told The Post that every search should require a criminal case number as "standard expected practice" because it could help "make lying harder and detection easier for a department that is well-managed enough to care."

Flock said last year that it would start allowing agencies to turn on the criminal-case-number requirement for its own officers, but it's an optional setting. A company spokesman told The Post that roughly 1 in 4 agencies had turned on the "audit assistance" feature, which sends in-app notifications to police supervisors.

Though Flock says in training guides that officers should detail a reason for each search, many of them have been justified with vague, one-word explanations, such as "investigation," that make it harder for internal-affairs teams to evaluate, documents reviewed by The Post show.

After DeFlock Joplin, an advocacy group in the Missouri city, requested audit logs from the police, the group said that 85 percent of searches had a one-word justification, such as "suspicious" or "drugs," and that less than 3 percent of searches had been linked to a criminal case.

Some experts suspect that many audit logs aren't being reviewed at all — and that, if they were, officials would discover more cases of misuse. The Institute for Justice and other groups have proposed that Flock searches should be permitted only for officers who have obtained a warrant from a judge, much like police searches in the real world. A Flock spokesman said the company isn't "capable or responsible for mandating a warrant," and Flock's defenders and investors have argued that the restriction would make the tool cumbersome and erode officers' investigative edge.

"Most of the time when you need license-plate information, it's a timeliness thing," said Quinn, the former police commander. Requiring a warrant, he said, could delay police from responding to active safety threats.

Police departments largely acknowledge that license-plate readers require oversight, but absent federal laws around the technology many of them have not implemented strict guidelines to prevent abuse, said Chuck Wexler, executive director of the Police Executive Research Forum, a nonprofit that advises agencies on policing practices.

"This is the nature of technology and policing," Wexler said. "Very often a technology will be farther ahead of policy, and that's what has happened, I think, with license-plate readers."

Some agencies that have set their own rules have found themselves scrambling to update them amid updates to the technology's power. Jim Sheehan, a New Jersey program coordinator who helps write policies followed by more than 500 law-enforcement agencies in the state, said he is helping to revise local license-plate-reader standards for the third time since the rules were adopted in 2010.

Some advocates, however, fear Flock's current approach merely allows police officials to police themselves. In Milwaukee, an internal-affairs detective investigating a fellow officer's misuse of Flock was found, in a separate investigation, to have misused Flock to surveil an unnamed victim and later admitted to installing a GPS tracker on the victim's car, according to a criminal complaint last month.

The detective, Tehrangi Chapman, was charged with misconduct in public office and misuse of a GPS device. Chapman and his attorney did not respond to requests for comment. Milwaukee Police Chief Jeffrey B. Norman said in a statement, "No one is above the law."

Torin Monahan, a professor at the University of North Carolina at Chapel Hill who studies surveillance, said Flock's resistance to stricter user oversight offers only "a performance of accountability" designed to minimize scandal and maximize new sign-ups from public-sector clientele.

"They don't want any impediments to police adoption," he said. "The more cameras that are on the network, the stronger the network becomes."

But David Ulevitch, a partner at Flock investor Andreessen Horowitz, said the more than 40 Flock misuse cases were "an infinitesimally small number" relative to the hundreds of thousands of officers nationwide. It's "truly a nonissue," he said in an interview, "… and by the way, that's 40 officers that now have been disciplined or charged or fired that otherwise would not have been, thank you to Flock."

For Bakely, the searches from her ex-boyfriend stopped in August 2025, according to search logs later made public and compiled by Have I Been Flocked. That month, she had filed for a restraining order against Steffman, writing that he “uses the traffic (Flock) cameras to track my location,” her petition said.

A judge denied her request, saying that Steffman’s conduct was “concerning” but that Bakely had no evidence to “support current allegations of stalking.” After he suggested Bakely file a complaint with the local sheriff’s office, that office then referred the case to the Georgia Bureau of Investigation. Three months later, when agents arrested Steffman, bureau officials said an investigation found he had misused the license-plate system “to harass and stalk multiple individuals.”

Steffman died before a trial could be initiated, and superior court records do not list an attorney. Calls, emails and text messages sent to four of Steffman’s family members were not returned. On LinkedIn, he had said he retired after a career in law enforcement focused on “ensuring that every resident feels seen, heard and protected.”

Braselton's town manager declined to comment, but a previous town manager said in a statement that the town was "disappointed by the circumstances and the charges." Five days before GBI announced his arrest, the town's Facebook page had posted a photo showing Steffman posing with the mayor and town council for a celebration of his 20 years of "dedicated service."

His "leadership and commitment," the post said, "have helped shape the department and strengthen the safety of our community."

*Patrick Marley contributed to this report from Madison, Wisconsin.*

## What readers are saying

The comments on the article express significant concerns about the misuse of Flock's surveillance technology, particularly by law enforcement officers. Many commenters highlight the potential for privacy violations and the lack of oversight, with some drawing parallels to a... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.